**ZENITH LABORATORIES, INC., on behalf of itself and all others similarly situated, Plaintiff,**

v.

**CARTER–WALLACE, INC., Defendant.**

**Civ. A. No. 368–72.**

United States District Court, D. New Jersey.

Aug. 20, 1974.

Richard D. Catenacci and Adrian M. Foley, Jr., McElroy, Connell, Foley & Geiser, Newark, N. J., for defendant.

David R. Simon, Simon & Allen, Newark, N. J., for plaintiff Zenith Laboratories, Inc.

## OPINION

STERN, District Judge.

This is a class action, originally instituted by Zenith Laboratories, Inc. against Carter-Wallace, Inc. in a one-count complaint, on behalf of "all purchasers of *licensed* bulk powder of the drug meprobamate from Defendant

Carter during the period from the grant of the meprobamate patent by the United States Patent Office to Defendant's assignors on November 22, 1955, to the invalidation of said patent by the United States District Court for the Eastern District of New York on February 18, 1972." (Emphasis added). The complaint sought damages in the amount of $130,000,000.00.

On November 7, 1973, the Honorable Lawrence A. Whipple granted Plaintiff's petition certifying this suit as a class action pursuant to Rule 23. On May 28, 1974 argument was heard before this Court pursuant to a motion by Plaintiff to amend its complaint by adding four additional counts. On June 11, 1974, leave to amend was granted with the express stipulation that a new determination as to the representative capacity of the Plaintiff be made. Argument on Plaintiff's representative capacity was held on July 22, 1974.

An understanding of this suit requires that related litigation between the identical parties be set forth with some detail.

Carter-Wallace (hereinafter "Carter") was granted a patent on November 22, 1955 for the drug meprobamate, also known as 2, 2 methyl-n-propyl 1, 3-propanediol dicarbamate. Meprobamate has various medical properties as an anti-convulsant and tranquilizer, and when combined with other drugs is useful in a variety of medical applications. It was sold commercially by pharmacies to the general public under the name of Milltown, among other names.

Following the issuance of the patent, Carter entered into licensing agreements with three firms: American Home Products Corp.; Merck and Co., Inc.; and the Lederle Division of American Cyanamid.

Pursuant to these agreements, the licensees were permitted to manufacture bulk meprobamate, and to resell the same to Carter. Carter then sold bulk meprobamate to purchasers, among them Ze-

nith Laboratories (hereinafter "Zenith").

In 1960 the Department of Justice filed suit against Carter for alleged violations of §§ 1 and 2 of the Sherman Act arising out of the sale of this bulk meprobamate. The lawsuit resulted in a consent judgment in 1962 which required Carter to sell meprobamate to purchasers, without post-sale restrictions, for the price of $20.00 per pound, with a provision for escalation to meet rising costs.

Following the Consent Decree, Carter supplied bulk meprobamate, through a variety of agreements, both to purchasers, including Zenith, under the consent judgment, and to licensees whose agreements antedated the consent judgment.

Zenith thereafter abandoned its bulk purchases of meprobamate at the price set by the consent judgment, and sought and obtained other sources of supply, apparently on the international market. Zenith was met with a patent infringement suit by Carter, filed in 1968 in this District.

Zenith responded with a three-count counterclaim. The first count alleged that Zenith had purchased meprobamate from Carter at $23.00 per pound at a time when the world market price in meprobamate was approximately 90¢ per pound. Zenith asked for damages of $7,500,000.00, alleging violations of the Sherman Act, §§ 1 and 2 (Title 15 U.S. C. §§ 1 and 2); and the Clayton Act, § 4 (Title 15 U.S.C. § 15), alleging price discrimination by Carter against Zenith, and *in favor* of the *licensees*—American Home, Merck and Lederle—with whom Carter had, according to Zenith, "illegal agreements."

The second count of the counterclaim focused on two licensing agreements between Carter and Lederle. The first agreement provided that Lederle would supply Carter's need for tridihexethyl iodide and tridihexethyl chloride, while Carter would supply Lederle's need for meprobamate. These drugs would be

combined by Lederle to form Pathibamate, and by Carter to form Milpath. The second agreement provided that Lederle would supply Carter with dextro amphetamine sulfate, and Carter would supply Lederle with meprobamate. This would permit Lederle to produce Bamadex, and Carter to produce Appetrol.

This second count charged gross price discrimination, and violation of § 1 of the Sherman Act by Carter, in concert with Lederle, against Zenith. The claim sought declaration of the invalidity of the patent, money damages, injunctive relief, and other relief.

The third count of the counterclaim alleged two agreements between Carter and Merck. First, it was alleged, Merck provided Carter with benactyzine, and Carter provided Merck with meprobamate, in order that Merck could produce Suavitil and Carter could produce Deprol. Second, it was alleged, Merck would provide Carter with hydrochlorothiazide and Carter would provide meprobamate to enable Merck to produce Cyclex and Carter to produce Caplaril or Miluretic.

This licensing arrangement, Zenith claimed, violated § 1 of the Sherman Act in that *each side agreed* not to sue the other for patent invalidity and that *Merck* was granted *discriminatory price reduction in meprobamate.*

While the Carter claim for patent infringement and the Zenith counterclaim were still pending here, the patent for meprobate was declared invalid for obviousness in light of the state of the prior art (35 U.S.C. § 103), in an unrelated case in the Eastern District of New York on February 18, 1972. Carter-Wallace, Inc. v. Davis Edwards Pharmacal Corp., 341 F.Supp. 1303 (E.D.N.Y.1972), aff'd sub nom, Carter-Wallace, Inc. v. Otte, 474 F.2d 529 (2nd Cir. 1972), cert. denied 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973). Carter's suit against Zenith was thereafter dismissed here, leaving only Zenith's antitrust claims which were predicated on the illegal agreements between Carter and its *licensees*.

On February 25, 1972, one week after the declaration of patent invalidity, Zenith commenced a new and separate action, the case *sub judice*, in the form of a class action alleging that "by reason of the invalidity of Defendant Carter's meprobamate patent, Plaintiff Zenith and the members of the class represented by Plaintiff are entitled to recover the payments made to Defendant for the use of its invalid patent in the purchase of *licensed* bulk meprobamate powder from Defendant . . . " (Emphasis added).

Included as members of the class by Zenith were the three licensees, American Home Products, Merck and Lederle, whom Zenith had alleged as being part of illegal price discrimination agreements with Carter in Zenith's counterclaim to the first action, then still pending. Zenith, although itself not a licensee of Carter,[1] claimed to be an appropriate representative of that class.

If Carter-Wallace, Inc. v. Davis Edwards Pharmacal Corp., was the father of the instant action, the mother was a decision three months earlier in the District Court for the Western District of Tennessee granting summary judgment to a licensee of a patent against its licensor. Troxel Manufacturing Co. v. Schwinn Bicycle Co., 334 F.Supp. 1269 (1971), rev'd 465 F.2d 1253 (6th Cir. 1972).

The District Court opinion in *Troxel, supra,* held that a *licensee* could recover *royalties* paid pursuant to a patent that was *subsequently* declared invalid, *i. e.,* royalties paid prior to the determination of invalidity. Thus, three months after the District Court's *Troxel* decision and one week after the decision in Carter-Wallace, Inc. v. Davis Edwards Pharmacal Corp., *supra,* Zenith instituted this

---

1. A fact which does not appear on the face of the complaint.

"class action" seeking to recover "royalties" paid on the "licensed" meprobamate on behalf of all purchasers.

At this point in time, Zenith was thus waging two suits against Carter: on the one hand, the surviving counterclaims from the 1968 cause of action sounding in anti-trust alleging illegal agreements between Carter and its licensees against Zenith, a non-licensee; and on the other hand, the 1972 suit for recovery of "patent payments" based on the invalidity of the meprobamate patent which Zenith, a non-licensee, brought on behalf of all licensees and purchasers of Carter.

This situation ended when, on the eve of trial in 1974, Plaintiff voluntarily dismissed Counts 1 and 3 of its counterclaim with prejudice. The remaining count, Count 2, was subsequently settled between the parties pursuant to terms that are confidential.

On August 11, 1972, the United States Court of Appeals for the Sixth Circuit reversed the granting of summary judgment in *Troxel, supra*, and held that the mere invalidation of a patent did not, in and of itself, entitle the licensee to recoup royalties paid previously, although it noted that a finding of fraud committed on the Patent Office in obtaining a patent might give a subsequent licensee a cause of action for previously paid royalties under the fraudulently obtained patent. 465 F.2d at 1253.

Zenith, after the decision of the Sixth Circuit was announced, moved to amend its complaint herein to allege, *inter alia*, fraud committed on the Patent Office in the obtaining of the patent on meprobamate. Despite the coincidental patterns between the holdings in the various *Troxel* opinions and the Zenith litigation, Plaintiff denies it has based its cause of action on *Troxel* and maintains that its original cause of action is still valid.

The original complaint alleged that "by reason of the invalidity of Defendant Carter's meprobamate patent, Plaintiff Zenith and the members of the class represented by Plaintiff are entitled to recover the payments made to Defendant for the use of its invalid patent in the purchase of licensed bulk meprobamate powder from Defendant during the period from 1955 to 1972, estimated at $130,000,000.00 in royalties for said product."

On June 11, 1974, after briefs and extensive oral argument, this Court permitted Plaintiff to amend its complaint by adding four new counts to the complaint.

The new five-count complaint can be summarized as follows: The first count is identical to the language of the single count of the original complaint; the second count alleges unjust enrichment as a result of payments made pursuant to the invalid patent; the third count alleges a failure of consideration due to the invalidity of the patent; the fourth count alleges a mistake as to material fact by Zenith and the other members of the class going to the invalidity of the patent; and the fifth count alleges that fraud was committed on the Patent Office.

Plaintiff characterizes Counts 2 through 4 as mere reformulations of the first count of its complaint. Plaintiff maintains that its original complaint included those causes of action spelled out in Counts 2 through 4, and that it has done nothing more than set forth explicitly what was already implicit in its original complaint. Despite Plaintiff's protestations, this Court permitted Plaintiff to file an amended complaint with the provision that a new Rule 23 determination would be made on what was now a new complaint.

Throughout this proceeding, plaintiff has sought to avoid this new Rule 23 determination. Rule 23(c)(1) states:

As soon as practicable after the commencement of an action brought as a class action, the court *shall determine* by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be

altered or amended before the decision on the merits. (Emphasis added)

■ Plaintiff first maintained that such a determination may be made only after motion by a party. The language of Rule 23 is clear, and this Court is convinced that it must proceed to review the proposed class at an appropriate occasion with or without such a motion. Jeffery v. Malcolm, 353 F.Supp. 395 (S. D.N.Y.1973).

■ Next, Plaintiff argues that the prior Rule 23 determination made on the original one-count complaint, which is now Count 1 of the amended five-count complaint, should act as a determination of the class status of all counts of the amended complaint, and that amendments of the complaint made pursuant to Rule 15 do not require another Rule 23 determination. This cannot be the law. To permit a prior determination under Rule 23 to act as an umbrella under which new causes of action or additional theories of relief can gather via the liberally applied Rule 15, would sabotage the function of a Rule 23 determination. When Plaintiff chose to change its complaint by amendment it destroyed the vitality of the prior adjudication of class which was based on a different lawsuit.

Plaintiff then argues that inasmuch as Counts 2 through 4 are mere restatements of Count 1, they should be spared another Rule 23 determination. This Court rejects this argument. Counts 2 through 4 add new causes of action, change the lawsuit and require a new Rule 23 determination to be made on the entire amended complaint, albeit a prior determination was made on Count 1 when it served as the sole count of the original complaint.

In opposing such a re-determination, Plaintiff argues that the doctrine of the Rule of the Case applies, and that this Court is bound by the prior Rule 23 determination made by another judge on the original complaint, now Count 1 of

the amended complaint. Cf. TCF Film Corp. v. Gourley, 240 F.2d 711 (3rd Cir. 1957); United States v. Wheeler, 256 F. 2d 745 (3rd Cir. 1958).

■■ While this Court is in agreement that in ordinary litigation the doctrine of Rule of the Case is a salutary one, resulting in desirable continuity and preventing the continual relitigation of contested points during the course of a suit, it is equally clear that where courts are placed under a continuing duty by Rule 23 to monitor the cases and to review the class determination previously made, the doctrine of the Rule of the Case does not apply.

This is spelled out in the language of Rule 23(c)(1) cited above which states: "An order under this subdivision may be conditional, and *may be altered or amended* before the decision on the merits." (Emphasis added) Presented with the amended complaint, or even without such amendments, the prior judge had a right to review his prior determination as to class. The reassignment of the cause to a new judge for administrative convenience does not insulate the prior determination from a review which the Rules themselves require.

As stated in the supplementary note of the advisory committee with respect to Rule 23(c)(1): "A determination once made can be altered or amended before the decision on the merits if, upon fuller development of the facts, the original determination appears unsound. A negative determination means that the action should be stripped of its character as a class action." F.R.Civ.P. 23.

■ A suit found to be maintainable as a class action may subsequently be denied class action status "if as the case develops, it becomes apparent that the questions of fact and/or law are so dissimilar, as between members of the class represented by plaintiff, so as to render the class action unmanageable . . ." Brennan v. Midwestern

United Life Insurance Co., 259 F.Supp. 673, 683 (N.D.Indiana 1966). See also, Kristiansen v. John Mullins and Sons, Inc. 59 F.R.D. 99, 106 (E.D.N.Y.1973).

In this Court's review of the class status of all the causes of action asserted in the amended complaint, if it should appear that there is some infirmity in the position of plaintiff, so as to disqualify it as a representative of the class either because of new circumstances, or as a result of new law, this Court will not sacrifice the interests of the members of the class in mere pursuit of consistency with a prior ruling which, by virtue of Rule 23 itself, was never intended nor conceived to be final.

This Court will, therefore, proceed to an examination of the representative status of Plaintiff with reference to its ability to maintain a class action as to all five counts of the amended complaint.

Plaintiff asserts in its amended complaint that "the class consists of all *purchasers* of *licensed* bulk powder of the drug meprobamate from Defendant Carter during the period from the grant of the meprobamate patent by the United States Patent Office to Defendant's assignors on November 22, 1955, to the invalidation of said patent by the United States District Court for the Eastern District of New York on February 18, 1972. These *purchasers*, including

Plaintiff, are entitled to the recovery of all *royalties* (i. e., amounts attributable to the existence of the patent) paid by them to Defendant for licensed meprobamate powder since 1955 . . . ." (Emphasis added)

This artfully drawn complaint seeks to create typicality of claims where none exists, between those actual *licensees* paying royalties pursuant to license agreements under the Carter patent, and those purchasers who had no such licensing agreement, but whose cost in procuring bulk meprobamate from Defendant was allegedly higher because of the existence of the patent and the resultant monopoly enjoyed by Carter.

Plaintiff seeks to lump these payments, royalties and purchase price, under one category, i. e., "amounts attributable to the existence of the patent," seeking to appear as one of those parties given a cause of action in the now reversed District Court holding in *Troxel, supra.* Such artful language does not remove the distinctions between purchasers and licensees.

This is clear when examining the basis for the *Troxel* decision, Lear v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L. Ed.2d 610 (1969), which permitted the defense of patent invalidity when a *licensee* was sued for royalties due and owing under a license agreement.[2]

**2.** Prior to *Lear, supra,* the general rule was enunciated by Automatic Radio Manufacturing Co. v. Hazeltine Research Inc., 339 U.S. 827, 836, 70 S.Ct. 894, 899, 94 L.Ed. 1312 (1950) : "The general rule is that the *licensee* under a patent license agreement may not challenge the validity of the licensed patent in a suit for *royalties* due under the contract." (Emphasis added) (Cites omitted) Thus, where a patent had not been previously held invalid, a licensee could not repudiate his license contract by himself alleging the invalidity of the patent which is the predicate of the contract.

*Lear, supra,* reversed Automatic Radio Manufacturing Co. *supra,* as to the above-quoted "general rule." The *Lear* opinion rejected the notion of *"licensee* estoppel" in the interests of the policy that "ideas in general circulation be dedicated to the com-

mon good unless they are protected by a valid patent." 395 U.S. 653, 668, 89 S.Ct. 1902, 1910, 23 L.Ed.2d 610.

Under *Lear,* a *licensee,* sued for patent infringement on the basis of his refusal to pay royalty payments due, could assert patent invalidity as a defense.

The District Court opinion in *Troxel, supra,* interpreted this holding to permit not only the refusal to pay future royalties due under the license agreement, but also the recovery of *previously paid royalties* by *licensees* who paid such royalties pursuant to a patent subsequently declared to be invalid.

In reversing the grant of summary judgment, the Circuit Court held that a finding of patent invalidity released the licensee from future payments of royalties accruing *after* the declaration of invalidity *only,* and did not, in and of itself, entitle the licensee

In arguing the merits of its claim, Plaintiff demonstrates the absence of typicality with the very class which it purports to represent, consisting of both purchasers and licensees of Carter. It asserts that the reversal of the *Troxel* opinion contains an exception, in footnote 5, pursuant to which Zenith may assert a cause of action. In relevant part this exception recognized that "it has been held, without reliance on *Lear,* that a *licensee* is entitled to recoupment of *royalties* paid when the *licensed* patent was procured fraudulently . . .." (Emphasis added) (Cites omitted) 465 F.2d at 1259.

■■ It is settled law that in determining whether a class action can be maintained under Rule 23 the court is not to look to the merits of the lawsuit. Kahan v. Rosenstiel, 424 F.2d 161 (3rd Cir. 1970), cert. denied 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). Thus, while this is not the appropriate time for the Court to rule on the merits of a cause of action asserted by Zenith under this exception, the Court does have a duty, under Rule 23, to determine whether or not the claims of the members of the class are typical, the defendant has different defenses to the claims of different class members, and the representative of the class has different interests from other class members. See, *e. g.,* Thomas v. Clarke, 54 F.R.D. 245 (D.Minn.1971). Thus viewing the complaint, it is clear that defenses to this cause of action which may be asserted by Carter against Zenith, on the grounds that Zenith is not a licensee, are not typical of the defenses that may be asserted against those members of the purported class who are licensees. "Where it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass then the named plaintiff is not a proper class representative." Koos v. First National Bank, 496 F.2d 1162 (7th Cir. 1974).

While a judge of this Court has previously found that a class had been properly constituted, this Court's review of the transcripts of the proceedings before that judge and the briefs submitted to him in support of the class determination reveal that Plaintiff continually represented itself as a "licensee" that was seeking to represent other "licensees" in obtaining the return of "royalty" payments paid by all of them under licensing agreements predicated on an invalid patent.

At page 5 of Plaintiff's brief, filed on August 20, 1973, on the issue of maintaining a class action, the issue of numerosity was discussed. "As the Complaint herein reveals, this action has been brought on behalf of nore than 100 class members. These members constitute all the various *licensees* of Carter-Wallace under its meprobamate patent . . . ." (Emphasis added).

At page 8 of its brief, Plaintiff argued that there are questions of law and fact common to the class: "This suit is of rather limited scope, as Plaintiff has simply asked for refund of *royalties* paid to Defendant pursuant to an invalid patent. There do not appear to be a multiplicity of factual and legal questions to be resolved. The questions which do exist, however, are common to each class member. The common questions of law are (a) whether a *licensee* under an invalid patent may recoup moneys paid to the patent owner under a *license agreement,* and (b) if so, how damages are to be determined. With the exception of the fact that the sums of money paid to Carter-Wallace will

---

to recoup royalties already paid absent a showing of fraud on the Patent Office. In footnote 5 of the opinion the Circuit Court indicated that such a showing of fraud might entitle a licensee to recover royalties paid prior to the determination that such fraud had been committed in the procuring of the patent, and the patent thereby declared invalid.

vary from member to member, the remaining factual questions are clearly common to all members of the class." (Emphasis added) Zenith was never a "licensee," never signed a "license agreement" and paid no "royalties."·

At page 9, Plaintiff argued that the claims of Zenith are typical of the claims of the class: "As structured, the representative Plaintiff's claim is certainly typical of that of every *licensee*. In short, Plaintiff is alleging that it is entitled to repayment of *royalties* paid to Defendant for the reason that Defendant is not entitled to retain moneys received on the basis of an invalid patent. Since the holding of invalidity collaterally estops Carter-Wallace from asserting the validity of its patent with regard to all *licensees* . . . if Plaintiff prevails, then *all others holding licenses* would also be entitled to recoup the *royalties* paid by them . . . ." (Emphasis added) (Cites omitted).

At page 10 of its brief, Plaintiff argued that it would fairly and adequately protect the interests of the class: "There can be no question in regard to antagonistic interests. If Zenith, the representative party, prevails, *every other licensee* will likewise prevail and receive the amount of *royalty* payments respectively due it." (Emphasis added)

At page 11, Plaintiff argued that if the suit were prosecuted as independent actions there would be a risk of incompatible standards applied, or that judgments would result that would dispose of the interests of potential class members:

"As structured, this lawsuit is extremely simple. Plaintiff, as representative of the class, is claiming the right to be *repaid royalty payments* previously *made by it* and others, as *licensees* to Carter-Wallace under the latter's invalid patent. Thus, Plaintiff alleges a unitary set of facts that gives rise to relief on the part of diverse but similarly situated persons." (Emphasis added)

At oral argument held before the Honorable Lawrence A. Whipple on September 24, 1973, at page 2 of the transcript, Plaintiff stated: "Each member of the proposed class, *including Zenith*, paid *royalties* to Carter-Wallace within the period and is entitled to the *return of those royalties* which in equity constitute unjust enrichment . . .." (Emphasis added)

While Defendant Carter sought to argue before the Court the lack of typicality on the licensee-purchaser distinction, it is important to note that in the letter opinion finding that a class had been properly convened, the prior court did not rule on or discuss this point. It is not unlikely that the prior court took plaintiff at its word when it styled itself a "licensee," which had paid "royalties" and sought only to represent other, similarly situated licensees.

At oral argument before this Court on the maintenance of this suit as a class action on the amended complaint, held on July 22, 1974, it was apparent that Plaintiff's representation of itself to Judge Whipple, in which it claimed to be a licensee who had paid royalties to Defendant, was based on its own unique definitions of terms "licensee" and "royalties." [3]

3. When pressed by this Court to restrict his answer to conventional definitions, counsel for plaintiff engaged in the following colloquy with the Court:

> MR. SIMON: In the terms of an agreement that your Honor is defining as what is a license agreement, the agreement between Zenith and Carter-Wallace *did not provide for a percentage royalty*, but it

did provide for a contract price for the bulk material which we believe included what was attributable to a royalty by virtue of the existence of the patent.

> THE COURT: Did you sit down and sign—do you know what a license agreement is?
> MR. SIMON: I think I do.
> THE COURT: Did you sign one?

In any event, as noted, Rule 23 requires that the Court constantly evaluate class actions to ascertain that the class is adequately protected, e. g., that the representative suffers from no legal infirmities to recovery atypical of the class, that could prejudice the recovery by other members of the class.

Plaintiff seeks to avoid this distinction by pointing to Count 5 of his complaint, with the argument that he seeks recovery under "the policy of the law which requires return of patent payments for an invalid patent that was procured by fraud." Plaintiff seeks to create a hybrid type of licensing agreement by combining *patent license royalties* made by *licensees*, with *purchase price payments* made by purchasers, and styling all such as "patent payments." Plaintiff has provided no authority to support his proposition.

It has been observed that "a mere sale of a patented article does not import a license except where the circumstances plainly indicate that the grant of a license should be inferred." 4 Deller's Walker on Patents, 2d Ed., § 393 at p. 559.

The cases cited in footnote 5 to the Circuit opinion in *Troxel* appear to recognize two causes of action in cases where fraud on the Patent Office is alleged. The first, as discussed above, is limited to recovery by licensees, and the second, not so limited and available to purchasers as well, is based on the anti-trust laws of the United States as expounded in Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L. Ed.2d 247 (1965).

Purchasers seeking to recover surplusage in purchase price due to non-competitive conditions created by a fraudulently procured patent may, in appropriate circumstances, have their cause of action in anti-trust; but this is not the suit which Zenith brought here.[4] Zenith

---

MR. SIMON: In terms of your Honor's definition, which, apparently, requires a royalty percentage, no.

THE COURT: Did other members of your class do that?

MR. SIMON: Do what, your Honor?

THE COURT: Sign a license agreement.

MR. SIMON: In your Honor's terms, of a percentage royalty, some did, yes, sir.

THE COURT: Are you saying that they stand on exactly the same basis you do? Do you stand on exactly the same basis they do? Or would you not agree with me that there are differences between your respective positions?

MR. SIMON: There is a difference, as your Honor pointed out.

THE COURT: Is that a difference with a legal significance?

MR. SIMON: No, sir. We pointed that out to Judge Whipple and Judge Whipple had before him both the license agreements that your Honor speaks of and the contracts purchased.

THE COURT: Where did you point out to Judge Whipple?

MR. SIMON: It was pointed out in the papers that were submitted. If not by Zenith's side, then by Carter's side. All of those agreements were before the Court.

THE COURT: Mr. Simon, where did you point it out to Judge Whipple?

MR. SIMON: I cannot, sitting here, referring to the papers before me, standing here, refer your Honor at this moment to the papers before Judge Whipple.

(Transcript of July 22, 1974 at pp. 37–38)

That plaintiff concludes there is no legal significance in the distinction between licensees and purchasers is apparent, but it is also apparent that Judge Whipple could not have engaged in the above exchange with plaintiff inasmuch as plaintiff did not say to him that although only a purchaser, it should be treated *as if* it were a licensee. The plaintiff instead represented to Judge Whipple that it *was* a licensee.

4. At oral argument, Plaintiff specifically denied that it was proceeding under any anti-trust theory.

MR. SIMON: May it please the Court, your Honor, we have submitted a memorandum. I don't intend to repeat everything in that memorandum. I would like to state that we have attempted to respond to your Honor's questions. The fifth count is not based on anti-trust and it is not barred by any prior action.

(Transcript of July 22, 1974, at p. 21)

THE COURT: So you have no anti-trust theory at all?

MR. SIMON: No.

does not sue here on such alleged antitrust violations by virtue of the invalid patent. It has already sued Carter on this cause, by its counterclaim in another suit, which, as noted, was settled and dismissed with prejudice.[5] While the Court noted that the dismissal purported to leave the present lawsuit undisturbed, this lawsuit then contained only the one count, obviously predicated on the District Court opinion in *Troxel,* and limited in its theory of recovery to mere invalidity of the patent and the resultant rights, on that basis alone, to the recovery of *royalty payments* made by *licensees.*

The short answer to Zenith's present position is that, whatever the right of a licensee who had earlier and erroneously entered into a license agreement and paid royalties in reliance on a patent it thought to be valid, but which was actually procured by fraud on the Patent Office, to recover *post* paid license royalties, Zenith, as a non-licensee, shares in it not at all. Zenith is limited to recovering, if it can, on a theory of anti-trust in which, like any purchaser, it may seek to establish the existence of an unfair monopoly. *Walker Process Equipment, Inc., supra.* This relief Zenith has already sought, obtained, and does not seek again in this lawsuit, or so it claims.

In sum, under this complaint, the present mix of purchasers and licensees does not form an appropriate class. Moreover, Zenith, a purchaser, is neither an appropriate representative for those who are licensees,[6] nor, as one who has already sued and recovered under anti-trust, an appropriate representative for other purchasers who themselves might be able to sue on antitrust and who would not be confronted, as Zenith is now confronted, with questions of both *res judicata* and collateral estoppel on the basis of a prior lawsuit.

For the foregoing reasons, it is accordingly adjudged that the suit of Zenith Laboratories, Inc. v. Carter-Wallace, Inc. may not be maintained as a class action, and the suit will continue as a private action between the named parties.

Pursuant to Rule 23(d)(4), Plaintiff is directed to amend its pleadings to eliminate allegations as to class representation.

THE COURT: So you are not bothered, even, if I say whatever was decided in the other lawsuit as to Counts 1, 2 and 3, would collaterally estop you? You say, 'So what?'

MR. SIMON: Counts 1, 2 and 3 of the other lawsuit, your Honor?

THE COURT: Yes.

MR. SIMON: Nothing to do with this case.

(Transcript of July 22, 1974, at p. 49)

5. The settlement of the counterclaims to the 1968 suit occurred after the determination by Judge Whipple that the suit could proceed as a class action. Therefore the issues of collateral estoppel and *res judicata* could not have arisen at that time.

6. Whom Zenith has elsewhere charged were in monopolistic and illegal agreements with Carter to the detriment of Zenith.