ZENITH LABORATORIES, INC., on behalf of itself and all others similarly situated, Appellant,

v.

CARTER–WALLACE, INC.

No. 75–1570.

United States Court of Appeals, Third Circuit.

Argued Nov. 18, 1975.

Decided Feb. 10, 1976.

David R. Simon, Simon & Allen, Newark, N.J., for appellant.

Andrian M. Foley, Jr., McElroy, Connell, Foley & Geiser, Newark, N.J., Breed, Abbott & Morgan, New York City, for appellee.

Before VAN DUSEN, ADAMS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

The question raised by this appeal, whether a licensee or purchaser from a patentee may recover excess payments attributable to a patent subsequently declared invalid, is one of first impression in this court.[1] Zenith Laboratories, Inc. (Zenith), a bulk purchaser of a patented drug, sued the patentee, Carter-Wallace, Inc. (Carter), in the United States District Court for the District of New Jersey[2] for recovery of $130 million in excess payments allegedly made by a class of licensees and purchasers from Carter. Zenith appeals from a grant of summary judgment in favor of Carter. We affirm the judgment of the district court.

### I.

Carter was granted a patent on the drug meprobamate in 1955 and immediately entered into license agreements with three companies.[3] One of these agreements became the subject of an antitrust suit by the Government in *United States v. Carter Products, Inc.*, 211 F.Supp. 144 (S.D.N.Y.1962). Pursuant to the consent decree entered in that case, Carter began selling bulk meprobamate on non-discriminatory terms under a price ceiling to "qualified pharmaceutical houses" as specifically defined by it in its "confirmation of sale." Zenith and ninety-two other pharmaceutical houses purchased meprobamate under terms set forth in the confirmation of sale.

Zenith, however, claims that Carter's prices for meprobamate were so exorbitant compared to prices prevailing on the world market that Zenith soon began to buy bulk meprobamate abroad. In response, Carter filed a patent infringement suit against Zenith, which Zenith defended by asserting *inter alia* that Carter's patent was invalid, that Carter had consented to Zenith's manufacture, use, and sale of meprobamate, and that Carter was in violation of federal antitrust laws by misuse of its patent. Zenith also set forth a three-count counterclaim based on Carter's alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (1971) as follows: (1) price-fixing and monopoly of the manufacture, distribution, and sale of meprobamate beyond the scope of the patent; (2) a combination and conspiracy with Lederle to restrain trade and to tie an unpatented product to a patented one; and (3) a combination and conspiracy with Merck to restrain trade and to pool patents.

While the infringement suit against Zenith was pending, Carter's meprobamate patent was held invalid on the basis of obviousness in an unrelated case, *Carter-Wallace, Inc. v. Davis Edwards Pharmacal Corp.*, 341 F.Supp. 1303 (E.D. N.Y.1972), *aff'd sub nom. Carter-Wallace, Inc. v. Otte*, 474 F.2d 529 (2d Cir. 1973). Carter's claim in this action was therefore dismissed, leaving only Zenith's counterclaim still before the court. Counts I and III of the counterclaim were voluntarily abandoned by Zenith, and an order of dismissal with prejudice

---

1. A related question, the liability of a licensee for royalties which it did not pay before the underlying patent was declared invalid, was noted but not decided by this court in *American Sterilizer Co. v. Sybron Corp.*, 526 F.2d 542, n.10 (3d Cir. 1975).

2. Jurisdiction was asserted under 28 U.S.C. § 1332 (1971) as Zenith is a New Jersey corporation with its principal place of business in New Jersey, Carter is a Delaware corporation with its principal place of business in New York, and the amount in controversy exceeds $10,000.

3. They were American Home Products Corp., Lederle Division of American Cyanamid, and Merck & Co. The last two companies purchased the drug from Carter and used it in combination drugs specified by their agreements with Carter. American Home Products was the only licensee authorized to sell meprobamate in consumable form without first combining it with other drugs. However, it was not licensed to manufacture the bulk powder; Carter remained the sole manufacturer of the drug. American Home was prohibited from reselling the bulk powder and was restricted to sales in tablet form.

was entered, specifying that "this Order does not operate as a determination of this matter on the merits." Zenith also agreed to settle Count II and released its claims thereunder.[4]

Before settlement of Count II, Zenith initiated the present suit in the United States District Court for the District of New Jersey against Carter on behalf of purchasers of meprobamate to recover "all royalties (i. e., amounts attributable to the existence of the patent)" paid to Carter since the patent issued in 1955. Judge Whipple certified the class pursuant to Fed.R.Civ.P. 23(c)(1).

Zenith's original complaint contained one count and was based upon *Troxel Manufacturing Co. v. Schwinn Bicycle Co.*, 334 F.Supp. 1269 (D.Tenn.1971).[5] It alleged the right to recover excess payments without elaborating the theory on

which it grounded its action.[6] The district court in *Troxel* had awarded to a licensee royalties paid under an invalid patent purportedly applying the federal patent policy articulated in *Lear v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969).

■ After the Court of Appeals for the Sixth Circuit reversed the district court decision in *Troxel*, Zenith amended its complaint in order not to rely exclusively upon the overruled holding. It added three counts which listed equitable theories of recovery.[7] In addition, Zenith set forth an entirely new cause of action for fraud on the Patent Office, apparently seeking to fit within the exception for recovery of payments made under a fraudulently obtained patent recognized by the appellate court in *Troxel*.[8] 465 F.2d 1259 n.5.

4. Zenith agreed to release Carter from the following:

> . . . any and all claims asserted in the Second Count of the Amended Answer and Counterclaim in [the infringement suit], including any and all claims it has asserted or could have asserted in said Second Count against Carter or Hoyt under Section 2 of the Clayton Act (15 U.S.C. § 13), provided, however, that nothing herein shall affect the claims now pending in the [case sub judice], provided, further, that Zenith agrees that it *does not* and *will not assert* any claims in [the case sub judice] that *have herein been released.* [Emphasis supplied.]

5. *Rev'd*, 465 F.2d 1253 (6th Cir. 1972), *app. on remand*, 489 F.2d 968 (6th Cir. 1973), *cert. denied*, 416 U.S. 939, 94 S.Ct. 1942, 40 L.Ed.2d 290 (1974). Zenith admits as much in its brief to this court.

6. The complaint averred:

> By reason of the invalidity of Defendant Carter's meprobamate patent, Plaintiff Zenith and the members of the class represented by Plaintiff are entitled to recover the payments made to Defendant for the use of its invalid patent in the purchase of licensed bulk meprobamate powder from Defendant during the period from 1955 to 1972, estimated at $130 million.

7. The amended complaint alleged, in pertinent part:

> [Second Count] [R]etention by Carter of the sums paid to Carter by Zenith and the other members of the within class pursuant to the said invalid patent is inequitable and would constitute the unjust enrichment of Carter in the amount of $130 million . . . ..

[Third Count] The invalidity of the Carter patent constitutes a failure of consideration and entitles the Plaintiff and the other class members to restoration of all moneys paid by virtue of the existence of said patent. [Fourth Count] The lack of knowledge [of the invalidity of the patent] on the part of Zenith and the other members of the class constituted a mistake as to a material fact. Said mistake entitles Zenith and other class members to be reimbursed for all sums paid by them to Carter by virtue of the existence of said patent as a result of said mistake of material fact.

8. Count V of Zenith's complaint reads as follows:

> Each of these [above-mentioned] omissions and misrepresentations constituted a fraud on the Patent Office, and entitles the Plaintiff and other class members to the return of moneys paid by them to Defendant by reason of said patent.

Carter contends that Counts II through V are covered by the release executed in the earlier infringement suit. Under that release, Carter would claim protection from all claims by Zenith except the one then pending in the instant case (present Count I). However, we read the release to protect Carter from the *assertion of only those claims* which were or could have been included within Count II of the antitrust counterclaim in the infringement suit (i. e., combination with Lederle to tie an unpatented article to a patented one) or which concerned price-fixing under Section 2 of the Clayton Act. Other theories of recovery are not reached by the release, and Zenith therefore was free to assert them here.

Judge Stern, who had replaced Judge Whipple by normal rotation, reconsidered the prior class certification after Zenith had amended its complaint. He determined that the asserted class was an improper mix of licensees and mere purchasers and concluded that Zenith was not an appropriate class representative of either group. *Zenith Laboratories, Inc. v. Carter-Wallace, Inc.*, 64 F.R.D. 159 (D.N.J.1974). Zenith was ordered to amend its pleading to eliminate class allegations, and the case continued as a private action.

Thereafter, the court entered summary judgment in favor of Carter because it could find no theory upon which Zenith was entitled to recover its excess payments to Carter. Zenith appeals from both the judgment against it and the denial of class status.

## II.

■ Zenith's contention that Judge Whipple's certification of the class constituted the "rule of the case" and should not have been overturned is answered by Fed.R.Civ.P. 23(c)(1), which provides: "An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits." This court, in *Interpace Corp. v. Philadelphia*, 438 F.2d 401 (3d Cir. 1971), declared that a district court is obliged to take cognizance of a changed factual situation and may alter an earlier order accordingly. Moreover, the Committee Notes on Rule 23 envision modification of a class certification "if, upon fuller development of the facts, the original determination appears unsound."

Zenith insists that no new facts had been developed to justify a redetermination under Rule 23(c)(1). We disagree. It is undisputed that the prior action, which was pending when the first class determination was made, had been set-

tled at the time of the second determination. In addition, Zenith had added four counts to its complaint, at least one of which was not even anticipated in its first complaint. Judge Stern also believed that Judge Whipple's class certification might have been based upon the erroneous assumption that Zenith was an express licensee of Carter. These considerations warranted the reevaluation of the original class certification.

■ We affirm the district court's denial of Zenith's motion for class certification because the district court did not err in holding that Zenith is an improper class representative. If Zenith were allowed to represent the alleged class, Carter could assert defenses against it which would not be applicable to the class as a whole, such as *res judicata* based on the disposition of Zenith's counterclaims in the earlier suit. Since these unique defenses could conceivably become the focus of the entire litigation and divert much of Zenith's attention from the suit as a whole, the remaining members of the class could be severely disadvantaged by Zenith's representation. *Koos v. First National Bank*, 496 F.2d 1162, 1164–65 (7th Cir. 1974).

## III.

■■ In our discussion of the entry of summary judgment against Zenith, we must first treat Zenith's claim that it is a licensee. The district court concluded that Zenith was a mere bulk purchaser, rather than a licensee, and based its decision on that characterization of Zenith's status. We believe that Zenith would not be entitled to recover royalties even if it were a licensee; as a mere purchaser, its claim would be even weaker. Thus, we need not decide whether Zenith is an implied or express licensee or whether it is an outright purchaser,[9]

9. The United States Supreme Court distinguished sales from licenses in *United States v. General Electric Co.*, 272 U.S. 476, 489–90, 47 S.Ct. 192, 71 L.Ed. 362 (1926):

It is well settled . . . that where a patentee makes the patented article, and sells it, he can exercise no future control over what the purchaser may wish to do with the arti-

cle after his purchase. It has passed beyond the scope of the patentee's rights. But the question is a different one which arises when we consider what a patentee who grants a license to one to make and vend the patented article may do in limiting the licensee in the exercise of the right to sell.

\* \* \* \* \* \*

for Zenith cannot succeed under either construction of its relationship with Carter.

Let us assume, *arguendo*, that Zenith is indeed a licensee in order to demonstrate that even the strongest case for Zenith cannot result in a recovery. First, since Count I derives from the district court's decision in *Troxel*, which was reversed on appeal, it must fall if we adopt the appellate court's contrary position. Suits such as this one have recently been disposed of on the authority of the appellate decision in *Troxel*, 465 F.2d 1253. *Kraly v. National Distillers and Chemical Corp.*, 502 F.2d 1366 (7th Cir. 1974); *Ransburg Electro-Coating Corp. v. Spiller & Spiller, Inc.*, 489 F.2d 974 (7th Cir. 1973).

The reasoning of the *Troxel* appellate court is persuasive. Federal patent policy in favor of early adjudications of invalidity, it argued, would be defeated by allowing recovery of past royalties:

> [S]uch an interpretation of *Lear* would make it advantageous for a licensee to postpone litigation, enjoy the fruits of his licensing agreement, and sue for repayment of royalties near the end of the term of the patent.

465 F.2d at 1257. Furthermore, the prospect of refunding all royalties collected would constitute such a cloud over a licensed patent that patenting would be discouraged. Thus, *Troxel* adhered to

the earlier ruling of the Sixth Circuit in *Drackett Chemical Co. v. Chamberlain Co.*, 63 F.2d 853 (6th Cir. 1933), that the obligation to pay royalties ends upon "eviction"[10] from the license by an adjudication in a court of competent jurisdiction of invalidity of the underlying patent. However, a licensee is precluded from recouping royalties already paid.

We concur in the Sixth Circuit's decision in *Troxel* and must, therefore, affirm the district court's holding that Count I fails to state a cause of action upon which relief can be granted.

Counts II through IV are grounded in state contract law rather than federal patent policy. *Luckett v. Delpark*, 270 U.S. 496, 502–503, 46 S.Ct. 397, 70 L.Ed. 703 (1926).[11] They attempt to develop a cause of action by use of equitable theories which have heretofore been successful only as defenses to a licensor's suit for royalties. Their common basis is the concept that a licensee is "evicted" from the license at the time of adjudication of invalidity of the underlying patent.[12] By the same token, no eviction occurs *until* such adjudication. *Headley Good Roads Co. v. Barber Asphalt Paving Co.*, 292 F. 119 (3d Cir. 1923).[13]

Since the foregoing counts are predicated on state law, we must determine which state's law shall be applied. We note that this case is cognizable in federal court only because of diversity of

---

He does not thereby sell outright to the licensee the articles the latter may make and sell or vest absolute ownership in them. He restricts the property and interest the licensee has in the goods he makes and proposes to sell.

*Id.* at 489–90, 47 S.Ct. at 196 (cases omitted). *Accord, Agrashell Inc. v. Hammons Products Co.*, 479 F.2d 269, 279 (8th Cir. 1973), *cert. denied*, 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973); *United States v. Masonite Corp.*, 316 U.S. 265, 277–78, 62 S.Ct. 1070, 86 L.Ed. 1461 (1941).

If Zenith were a mere purchaser, its claim of recovery of that portion of the purchase price attributable to the patent would be substantially undercut. As Corbin states: "Having made an article of commerce, a patentee is privileged to withhold it from sale at any price, or to offer it for sale at any price he wishes, however low or high." 6A Corbin, Contracts § 1410 at 246 (1962).

10. "Eviction" occurs when the patent is adjudged invalid so that there is a complete failure of consideration. 4 Walker, Patents § 404 (Supp.1975).

11. *See also Scherr v. Difco Laboratories*, 401 F.2d 443, 445 (6th Cir. 1968); *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.*, 176 F.2d 799, 807 (1st Cir. 1941) (dictum), *aff'd*, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). An unrelated holding of *Hazeltine* was overruled in *Lear v. Adkins, supra.*

12. *Scherr, supra; Hazeltine, supra* at 807–808 (applied only to exclusive licensees); *Drackett, supra*; 4 Walker, Patents § 404 (2d ed.1965).

13. *See also Drackett, supra*, 63 F.2d at 854; *McKay v. Smith*, 39 F. 556 (1st Cir. 1889); 14 Business Organizations—Patents § 2.15 (1974); 4 Walker, Patents § 404 at 619 (2d ed. 1965).

citizenship. We are compelled to follow the choice of law rules of New Jersey, the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The contract took effect upon receipt of the sales agreement in New York, where Carter maintains its corporate headquarters. Therefore, New Jersey courts would most likely give effect to the following provision in the sales contracts between Zenith and Carter:

> The law of New York shall apply and govern with respect to the construction and enforcement of this agreement.

*See Monsanto Co. v. Alden Leeds, Inc.*, 130 N.J.Super. 245, 326 A.2d 90, 95 (1974); *Shotwell v. Dairymen's League Cooperative Ass'n.*, 37 A.2d 420, 422, 22 N.J.Misc. 171 (N.J.Dist.Ct.1944).

This provision conceivably could be construed to require the application of New York choice of law rules, not necessarily the substantive law applicable to the issues before us. However, New Jersey courts and this court, applying New Jersey choice of law rules in *Farris Engineering Corp. v. Service Bureau Corp.*, 406 F.2d 519 (3d Cir. 1969) (per curiam), have held that by such a contractual provision the parties intended that the substantive law of the specified state would govern.

Our inquiry here falls within the terms of the foregoing contractual provision. We are concerned with the effect of patent invalidity upon payments made pursuant to the contract; thus, we are in effect deciding whether or not to enforce the agreement. In our consideration we apply New York law to state law counts of Zenith's complaint.

The United States Court of Appeals for the First Circuit construed New York cases to hold the defense of eviction available only to an exclusive licensee.[14] Under this reading of New York

law, Zenith, as a non-exclusive licensee, would not be able to raise eviction as a defense to royalties which fell due after Carter's patent was held invalid, much less use it offensively, as here, to recoup royalties paid before the adjudication of invalidity. New York cases also hold that exclusive licensees are liable for royalties under an admittedly invalid patent until an *adjudication* of invalidity is rendered. *Herzog v. Heyman*, 151 N.Y. 587, 45 N.E. 1127 (1897), and *Marston v. Swett*, 82 N.Y. 526 (1880), cited in *Victory Bottle Capping Machine Co. v. O & J Machine Co.*, 280 F. 753, 759–60 (1st Cir. 1922). Certainly, if an exclusive licensee must await adjudication of patent invalidity before it is deemed to be evicted from its license, a non-exclusive licensee, as Zenith claims to be, has less justification to claim an eviction before such adjudication.

In sum, Zenith could have used the theories contained in Counts II through IV as defenses, assuming it was a licensee, had Carter sued for royalties due *after* its patent had been declared invalid. It could not have asserted them successfully in an action by Carter for royalties owed *before* the adjudication. *A fortiori*, it cannot now assert these theories in an action to recover royalties actually paid before an adjudication of invalidity.

Finally, we reach Count V, which alleges a right to recovery based on Carter's claimed fraud on the Patent Office. Zenith has consistently denied in the district court and in this court that Count V derives from an antitrust theory.[15] *Zenith Laboratories, Inc. v. Carter-Wallace, Inc.*, 64 F.R.D. 159, 168 n.4 (D.N.J. 1974). Rather, Zenith characterizes its claim as one based on common law fraud, which it contends was also the basis of the cases mentioned as still viable in the first *Troxel* appellate opinion.

---

14. *Hazeltine, supra,* 176 F.2d at 808. It so interpreted the leading New York case in the area, *Marston v. Swett*, 82 N.Y. 526 (1880).

15. *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), is

authority for the proposition that fraud on the Patent Office strips a patentee of the exemption it would otherwise enjoy from antitrust laws. The cause of action recognized in *Walker* is not founded on the fraud itself but rather on an independent antitrust violation.

The cases cited in *Troxel* develop essentially two common law causes of action for fraud, neither of which applies to Zenith.[16] First, where fraud is practiced directly on the licensee, for example, inducement by misrepresentation to enter into a licensing agreement, the licensee has a cause of action. *SCM Corporation v. Radio Corporation of America*, 318 F.Supp. 433 (S.D.N.Y.1972). Second, another legally cognizable claim is for unfair competition based on the inequitable advantage that one party gains from a fraudulently obtained patent which obstructs another party's efforts to develop and market a similar product. *Struthers Scientific and International Corp. v. General Foods Corp.*, 334 F.Supp. 1329 (D.Del.1971); *Corning Glass Works v. Anchor Hocking Glass Corp.*, 253 F.Supp. 461 (D.Del.1966). Zenith alleges neither that it was induced to enter a licensing agreement nor that it was prevented from realizing profits on its own drug invention. Thus, its bald assertion that it deserves to recover due to Carter's alleged fraud, not on it but on the Patent Office itself, does not state a claim on which relief can be afforded.[17]

We conclude, therefore, that Zenith has not stated a cause of action in any of the five counts of its amended complaint. The judgment of the district court will be affirmed.

16. Another theory requires the Government to cancel a patent *ab initio* for fraud. When this is done, a licensee can recover past royalties on a claim of unjust enrichment. *United States v. Hartford-Empire Co.*, 73 F.Supp. 979 (D.Del.1947); 14 Business Organizations-Patents § 7.09[2] (1974).

17. Zenith also cites *Nashua Corp. v. RCA Corp.*, 307 F.Supp. 152 (D.N.H.1969), aff'd, 431 F.2d 220 (1st Cir. 1970). There the district court found no fraud, and the Court of Appeals, accepting that finding as not clearly erroneous, did not reach the issue of recovery on the basis of fraud. Since the court did not address the question at issue here, *Nashua* is not authority for Zenith's position.