**Samuel E. HEBERT, et al.,**
**Plaintiffs-Appellants,**

v.

**MONSANTO COMPANY and Texas City,**
**Texas Metal Trades Council (AFL–CIO),**
**Defendants-Appellees.**

**No. 81–2395.**

United States Court of Appeals,
Fifth Circuit.

Aug. 9, 1982.

Thomas O. Brashier, Houston, Tex., for plaintiffs-appellants.

Tom M. Davis, Lawrence J. McNamara, Houston, Tex., for Monsanto Co.

William N. Wheat, Robert W. Rickard, Houston, Tex., for Texas Metal Trades Council.

Before GOLDBERG, WILLIAMS and GARWOOD, Circuit Judges.

PER CURIAM:

The judgment is affirmed on the basis of the opinion of the district court dated September 2, 1981. A copy of Judge Gibson's opinion is attached as an appendix to this opinion. We note that Judge Gibson's opinion states that "... the scope of the Title VII class action in this case is limited to issues of employment discrimination within the trucking department that bear some relationship to the issue of overtime work assignment," although the scope of the section 1981 class action is not so limited. We construe the scope of the judgment so far as it pertains to the class actions to be limited as indicated by Judge Gibson's opinion, including, with respect to the Title VII class action (but not the section 1981 class action), the limitation expressed by the above-quoted language from the opinion.

AFFIRMED.

## APPENDIX

### IN THE UNITED STATES DISTRICT COURT

### FOR THE SOUTHERN DISTRICT OF TEXAS

### GALVESTON DIVISION

| | |
|---|---|
| SAMUEL E. HEBERT, WILLIE J. NIXON, ROBERT MAY, JAMES EARLS and CARL E. BEARD, Individually and on behalf of all others similarly situated, <br><br> Plaintiffs <br><br> v. <br><br> MONSANTO COMPANY, TEXAS CITY, TEXAS, and TEXAS CITY, TEXAS METAL TRADES COUNCIL (AFL–CIO), <br><br> Defendants | CIVIL ACTION <br><br><br> No. 74–G–173 |

---

## MEMORANDUM AND ORDER

This is a class action employment discrimination suit brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, (1976), and the Civil Rights Act of 1870, 42 U.S.C. § 1981 (1976). Plaintiffs are adult black citizens of the United States and residents of the State of Texas, who at all times material to this lawsuit have been employed by the defendant Monsanto Company at its facilities in Texas City, Texas, and represented by defendant Texas City, Texas Metal Trades Council (Union) for the purpose of collective bargaining with Monsanto. Individually and for the class, plaintiffs seek injunctive, declaratory, and monetary relief.

Plaintiffs allege that Monsanto has maintained and continues to maintain discriminatory employment policies with respect to hiring, compensation, promotions, transfers, training, and other terms and conditions of employment which have the effect of limiting, classifying and segregating black employees solely on account of race. Defendant Union, it is alleged, has acquiesced and contrived to acquiesce in defendant Monsanto's unlawful employment policies. De-

fendants deny that they have engaged in any employment practices in violation of Title VII or section 1981.

This action came on for trial before the Court without a jury on March 2–6, 1981, the Court having jurisdiction over the parties and subject matter of this lawsuit pursuant to 42 U.S.C. §§ 2000e, *et seq.*, 42 U.S.C. § 1981, and 28 U.S.C. § 1343(4). The Court, having considered the evidence presented at trial, and the arguments of the parties as reflected in their trial and post-trial briefs, now enters this memorandum opinion pursuant to Rule 52 of the Federal Rules of Civil Procedure, reflecting its findings of fact and conclusions of law.

### I.

In 1971 a class action suit was instigated against Monsanto and the Texas City Metal Trades Council by George Sanders on behalf of all black employees similarly situated.[1] Prior to class certification, the parties presented a consent order for the Court's approval. Generally, the consent order provided both injunctive relief against the company and union practices and back pay

---

1. *Sanders, et al. v. Monsanto Company, et al.,* No. 71 G 211 (S.D.Tex.1974) (Noel, J.).

to the affected class.[2] The consent order allowed objecting class members to opt out upon request. Plaintiff Hebert, along with 39 other members of the class defined by the terms of the consent decree, exercised their right to be excluded.

In July of 1974, Hebert requested and received from the EEOC a "right to sue" letter, enabling him to proceed under Title VII in the instant litigation. He then commenced this suit on October 1, 1974, in conjunction with four other Monsanto employees who were definitionally excluded from the *Sanders* class by the terms of the consent decree.[3] The named plaintiffs sought to maintain the suit as a class action on behalf of black employees who were within the class certified in *Sanders*, but who elected to opt out, black Monsanto employees who were definitionally excluded from the *Sanders* class, and blacks who might apply for employment with Monsanto in the future. On April 15, 1976, Federal District Judge James Noel entered an order conditionally certifying a class in this action pursuant to Rule 23(b)(2), Fed.R.Civ.P. Excluded from that class, however, were the 40 employees who had elected to opt out of the *Sanders* consent decree. An interlocutory appeal was taken from this decision, and the Fifth Circuit Court of Appeals reversed with instructions to certify the class sought by plaintiffs. *Hebert v. Monsanto Co., Texas City, Texas*, 576 F.2d 77 (5th Cir. 1978). Subsequently, however, the Supreme Court held that interlocutory orders denying class action certifications were not appealable. *Gardner v. Westinghouse Broadcasting Co.*, 437 U.S. 478 [98 S.Ct. 2451, 57 L.Ed.2d 364] (1978). In light of *Gardner*, the Court of Appeals vacated its opinion in *Hebert* and dismissed the appeal for want of jurisdiction. 580 F.2d 178 (5th Cir. 1978).

In 1979 the plaintiffs sought to redefine the conditionally certified class pursuant to Federal Rule of Civil Procedure 23(c)(1). The plaintiffs' motion was consolidated with the defendants' motion to limit the issues which could be raised under Title VII of the Civil Rights Act. On October 6, 1980, this Court entered an order[4] conditionally certifying the following class pursuant to Federal Rule of Civil Procedure 23(b)(2):

(1) All blacks who were within the class certified in *Sanders*, but who elected to opt out;

(2) All black employees of Monsanto Company hired on or after June 4, 1963; and

(3) All blacks who apply for employment with Monsanto in the future.

With respect to defendants' motion to limit issues that could be raised by the plaintiffs under Title VII, the Court ruled that the scope of the plaintiffs' judicial complaint was limited to the scope of the EEOC investigation which reasonably could be expected to grow out of the charge of discrimination filed by plaintiff Hebert. *See Sanchez v. Standard Brands, Inc.*, 431

---

2. *See* Plaintiffs' Exhibit No. 1. A central feature of the *Sanders* decree was a job bidding procedure, designed primarily in connection with Monsanto's maintenance and production craft apprentice programs. The procedure provided for the posting of job vacancies and required interested employees to bid on posted vacancies. Vacancies were to be filled on the basis of bargaining unit seniority. Bargaining seniority was determined, under the terms of the collective bargaining agreement between Monsanto and the Union, on the basis of length of service in various groups, departments and crafts, rather than on the basis of plant-wide seniority. *See* Defendants' Exhibit No. 18, at pp. 17 19.

Members of the *Sanders* class, however, were granted certain remedial seniority rights, allow-

ing them to retain accumulated seniority earned in the labor craft and service department with seniority accrued in the first group or craft to which the class member transferred. This remedial seniority could be used once in bidding into another group or craft. After this, however, normal bargaining unit seniority would apply.

3. Generally, the *Sanders* class was comprised of blacks who, prior to June 4, 1963, were initially employed in the labor craft or service department. Blacks who were initially hired into other positions, and blacks hired into labor and service after June 4, 1963, were definitionally excluded from the class.

4. The order is reproduced herein as Exhibit A.

F.2d 455, 466 (5th Cir. 1970). This was because, of the named plaintiffs in this action, only Hebert had satisfied the jurisdictional prerequisites to a Title VII lawsuit by timely filing a charge with the EEOC and obtaining notice of his "right to sue." Thus, while plaintiffs in their original complaint alleged "across the board" discrimination by Monsanto with respect to its employment practices and policies, the Court concluded that the plaintiffs might raise these issues in the Title VII action only insofar as they related to discrimination in overtime work assignments in the trucking department at Monsanto.[5] The scope of the plaintiffs' section 1981 action, of course, was not affected by the Court's ruling.

## II.

At trial and in their post-trial briefs plaintiffs urge the Court to reconsider its prior ruling limiting the scope of issues to be considered pursuant to the Title VII action, relying principally on Plaintiffs' Exhibit No. 2, the EEOC Field Director's Findings of Fact in Case No. YAU 1–021, which consolidated the charges made the subject of the *Sanders* lawsuit with Hebert's charge of discrimination in overtime assignment in the truck department. Plaintiffs contend that because Hebert's charge was investigated concurrently with the *Sanders* charges, the scope of the issues in this action should be as broad as the scope of the issues in the *Sanders* action, particularly since those members of the present class who "opted out" from the *Sanders* consent decree were allowed to do so "without prejudice." Plaintiffs also rely on Hebert's testimony that he was requested by an EEOC investigator to arrange at least one meeting of the various charging parties in Case YAU 1–021 to discuss their charges, and that this meeting took place.

The Court previously indicated in its ruling on October 6, 1980, that the only issues that may be raised under Title VII in this action are those raised by Hebert's EEOC charge, together with those issues that may reasonably be expected to grow out of the

EEOC investigation of that charge. *See Terrell v. United States Pipe & Foundry Co.*, 644 F.2d 1112, 1123 (5th Cir. 1981); *Tillman v. City of Boaz*, 548 F.2d 592, 594 (5th Cir. 1977); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 566–67 (5th Cir. 1970). The principles underlying the rule of reason adopted by the Fifth Circuit permitting the scope of a Title VII suit to extend as far as, but no further than, the scope of the EEOC investigation which reasonably could grow out of the administrative charge are well established. The remedial purposes of Title VII, and the paucity of legal training among those whom it is designed to protect require that a court construe an EEOC charge with the utmost liberality. *Terrell v. United States Pipe & Foundry, supra*, at 1123. Additionally, the framework of Title VII and its goal of encouraging voluntary compliance through EEOC conciliation mandate judicial deference to the EEOC's interpretation of a charge. *Id.*

The Court remains unable to conclude that Hebert's administrative charge provides a mandate for the "across the board" Title VII action plaintiffs seek to maintain here. The Field Director's Findings of Fact in Case YAU 1–021 offer no evidence that the Commission's view of Hebert's charge and the concomitant investigation of that charge went beyond the issue of racial discrimination in the assessment of overtime. Although Hebert's charge was consolidated with the charges of the named plaintiffs in the *Sanders* lawsuit for purposes of investigation and fact finding, the Field Director's findings indicate that the Commission's "across the board" investigation, if it may be called that, was instigated by the charges filed by Wesley Sam, Jr., George Sanders, Robert Nelson, and Samuel Crittendon, and not by Hebert's charges of discrimination in overtime assignment in the trucking department. The charging parties involved in the *Sanders* lawsuit are not named plaintiffs in this action, and it is beyond peradventure that the EEOC investigation growing out of their charges cannot form the basis for a Title VII class

---

5. *See* Exhibit A, *infra*, at p. 8 10.

action in this lawsuit. *Eastland v. TVA,* 553 F.2d 364, 372 (5th Cir. 1977); *Thurston v. Dekel [Dekle],* 531 F.2d 1264, 1269–70 (5th Cir. 1976); *Oatis v. Crown Zellerbach Corp.,* 398 F.2d 496, 499 (5th Cir. 1967). Neither is an EEOC investigator request for Hebert's assistance in arranging a meeting of the charging parties evidence that the EEOC considered Hebert's charge a catalyst for a comprehensive investigation of the employment practices and policies of the defendants. Applying the rule of reason articulated in *Sanchez, supra,* in light of the additional evidence introduced by plaintiffs, the Court remains convinced that the scope of the EEOC investigation which reasonably could have grown out of Hebert's administrative charge does not provide the basis for the "across the board" Title VII action plaintiffs seek to maintain in the case *sub judice.* The Court reaffirms its previous determination that the scope of the Title VII class action in this case is limited to issues of employment discrimination within the trucking department that bear some relationship to the issue of overtime work assignment.

### III.

All parties to this suit agree that Title VII limits the defendants' liability to matters occurring within 180 days of the filing of Hebert's administrative charges. The limitations period for liability under section 1981 extends for two years from the commencement of judicial proceedings. Hebert's charge with the EEOC was initially filed on June 20, 1970, and amended on June 29, 1970. Commission regulations mandate that amended charges which merely clarify or amplify allegations in a prior charge relate back to the effective date of the earlier charge. *Terrell v. United States Pipe & Foundry, supra,* at 1122; *see Weeks v. Southern Bell Telephone & Telegraph Co.,* 408 F.2d 228 (5th Cir. 1969). Thus, the relevant time period for plaintiffs' Title VII action extends back to, but no further than, December 23, 1969. Since this action commenced with the filing of plaintiffs' original complaint on October 1, 1974, the relevant time period under section 1981 begins on October 1, 1972.

Congress enacted Title VII to assure equality of employment opportunities and to eliminate those discriminatory practices and devices that foster racially stratified job environments to the disadvantage of minority citizens. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 348 [97 S.Ct. 1843, 1861, 52 L.Ed.2d 396] (1977); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800 [93 S.Ct. 1817, 1823, 36 L.Ed.2d 668] (1973). To achieve this purpose, Congress proscribed not only overt discrimination but also practices "fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–31 [91 S.Ct. 849, 852–53, 28 L.Ed.2d 158] (1973).

Thus, claims cognizable under Title VII may proceed under two separate but related theories: (1) disparate treatment, and (2) disparate impact. The latter concerns employment practices that are facially neutral in their treatment of different groups but that, in fact, fall more harshly on one group than another. *Teamsters, supra* [431 U.S.] at 336 n.15 & 349 [97 S.Ct. at 1854 n.15 & 1861]. To establish a prima facie case, the plaintiff need only show that the challenged employment practice selects applicants for hire, transfer, promotion or other employment considerations in a significantly discriminatory pattern. *Dothard v. Rawlinson,* 433 U.S. 321, 329 [97 S.Ct. 2720, 2726, 53 L.Ed.2d 786] (1977). The defendant may rebut the prima facie case of discrimination by showing that the challenged practice is manifestly job related; clearly, the touchstone is business necessity, *Griggs, supra* [401 U.S.] at 431–32 [91 S.Ct. at 853–54]. If the defense of business necessity is established, then plaintiff must demonstrate that an alternative to the challenged practice with less disparate impact exists that would serve the employer's legitimate interests. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425 [95 S.Ct. 2362, 2375, 45 L.Ed.2d 280] (1975). Proof of discriminatory motive is not required under a disparate impact theory. *Teamsters, supra* [431 U.S.] at 336 n.15 [97 S.Ct. at 1854 n.15]; *Griggs, supra* [401 U.S.] at 430–32 [91 S.Ct. at 853–54].

While the disparate impact analysis focuses upon the effect of a challenged practice or policy, the disparate treatment analysis requires scrutiny of the decision to employ the challenged practice or policy. Disparate treatment is perhaps the most easily understood type of discrimination. The employer simply treats some people less favorably then others because of their race, color, religion, sex, or national original. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. *Teamsters, supra. See, e.g., Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265–66 [97 S.Ct. 555, 563–64, 50 L.Ed.2d 450] (1977). As in disparate treatment cases arising under Title VII, a plaintiff must demonstrate under section 1981 that an employment decision was motivated by an impermissible discriminatory purpose. *Markey v. Tenneco Oil Co.,* 635 F.2d 497, 498 n.1 (5th Cir. 1981); *Crawford v. Western Electric Co.,* 614 F.2d 1300, 1309 (5th Cir. 1980); *Williams v. De-Kalb County,* 582 F.2d 2, 2–3 (5th Cir. 1978), *modifying* 577 F.2d 248 (5th Cir. 1978). *See Washington v. Davis,* 426 U.S. 229 [96 S.Ct. 2040, 48 L.Ed.2d 597] (1976).

In *McDonnell Douglas v. Green,* the United States Supreme Court set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. Because section 1981 is a "parallel remedy against discrimination which may derive its legal principles from Title VII," *Blum v. Gulf Oil Corp.,* 597 F.2d 936, 938 (5th Cir. 1979), the Fifth Circuit has concluded that the *McDonnell Douglas* criteria are equally applicable in cases arising under section 1981. *Crawford v. Western Electric, supra,* at 1309 & n.27.

Under *McDonnell Douglas,* the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. The prima facie case raises an inference of discrimination because it is presumed that an employer's acts, if otherwise unexplained, are more likely than not based on considerations of impermissible factors. *Texas Dept. of Community Affairs v. Burdine* [450] U.S. [248, 259, 101 S.Ct. 1089, 1097,] 67 L.Ed.2d 207, 216 (1981); *McDonnell Douglas, supra* [411 U.S.] at 802 [93 S.Ct. at 1824].[6] If the plaintiff succeeds in proving the prima facie case, the burden

---

**6.** *McDonnell Douglas* concerned a non-class claim of hiring discrimination. In that context, the Supreme Court held that a Title VII complainant may establish a prima facie case of racial discrimination by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that despite his qualifications, he was rejected; and (iv) after his rejection, the position remained open and the employer continued to seek applicants from persons of the complainant's qualifications. 411 U.S. at 802 [93 S.Ct. at 1824]. Courts have generally construed the final factor as requiring the plaintiff to establish that the applicant eventually hired in the position sought was not a member of the protected group to which the plaintiff belonged. *See, e.g., Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir. 1981).

In a hiring case, the *McDonnell Douglas* model creates an inference of discrimination, first, because it is presumed that an employer does not make decisions in a totally arbitrary manner, *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577 [98 S.Ct. 2943, 2949, 57 L.Ed.2d 957] (1978), and second, because the plaintiff is required to demonstrate from a preponderance of the evidence that his rejection did not result

from the two most common legitimate reasons why an employer might reject a job applicant: lack of qualifications or the absence of a vacancy in the job sought. *Teamsters, supra* [431 U.S.] at 358 n.44 [97 S.Ct. at 1866 n.44]. Elimination of these reasons for refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one. *Id.*

Although the *McDonnell Douglas* model literally applies only in hiring cases, it has been applied with minor adjustments in cases where an individual refusal to promote is challenged as discriminatory. *See, e.g., Bundy v. Jackson, supra,* at 951. Factual settings necessarily vary in Title VII cases, however, and the Supreme Court has repeatedly emphasized that the *McDonnell Douglas* model, or some variant thereof, simply cannot apply in every instance. The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof therein required, but in its recognition of the general principles that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act. *Teamsters, supra* [431 U.S.] at 358 [97 S.Ct. at 1866].

of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the employment decision. *Burdine, supra* [450 U.S. at 258, 101 S.Ct. at 1096,] 67 L.Ed.2d at 215; *McDonnell Douglas, supra.* The defendant may carry this burden through the introduction of admissible evidence of legitimate, nondiscriminatory reasons for an employment decision sufficient to raise a genuine issue of fact as to whether discrimination occurred. *Burdine, supra* [450 U.S. at 259, 101 S.Ct. at 1096], 67 L.Ed.2d at 216.

If the defendant carries his intermediate burden, the presumption raised by the plaintiff's prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. The plaintiff must be provided the opportunity to demonstrate that the defendant's proffered reasons were not the true reasons for the employment decision complained of. The plaintiff's burden in this regard merges with the ultimate burden of persuading the trier of fact that he or she has been the victim of intentional discrimination. The plaintiff may carry this burden by proving that (1) a discriminatory reason more likely motivated the employer, or (2) the employer's proffered explanation is unworthy of credence. *Id.*; *McDonnell Douglas, supra* [411 U.S.] at 804–05 [93 S.Ct. at 1824].

This generally outlines the legal framework within which the plaintiffs' claims of discrimination under Title VII and section 1981, and the evidence presented in support of those claims, must be viewed. The evidence offered at trial by the plaintiffs, derived from the testimony of live witnesses and statistical analysis, is essentially directed to the following claims of discrimination:

(1) Under Title VII, individual and class claims of discrimination in the assignment of overtime work in the truck department, and related employment practices in that department.

(2) Under section 1981, individual and class claims of discrimination with respect to the hiring, promotion and transfer of black employees. Plaintiffs contend:

(a) That Monsanto has engaged in discrimination by hiring blacks into less remunerative positions in the labor and service departments, and refusing to hire blacks into other crafts and departments;

(b) That Monsanto and the Union have discriminated against black employees in promotions and transfers into semi-skilled, skilled and supervisory positions through, *inter alia*, maintenance of educational requirements, including related training courses at the College of the Mainland in Texas City, Texas in connection with operator and craft apprentice programs; as well as aspects of the job bidding procedure implemented in 1974 as a result of the *Sanders* consent decree.

A. Individual and Class Title VII Claims

*1. The Classification of Overtime.* In 1970 Samuel Hebert was one of nine black Monsanto workers employed as truck helpers in the trucking department. At that time, the truck department was comprised of 22 employees: nine truck helpers, 13 truck drivers, and two dispatchers. All truck helpers were black; 11 out of 13 drivers were black with two white; and the dispatcher was white.

In the EEOC charge[7] which forms the basis of individual and class Title VII claims in this action, Hebert alleged that a provision contained in the 1970 collective bargaining agreement negotiated by defendants Monsanto and Union discriminated against black employees in the truck department. The provision in issue allotted overtime within that department on the basis of job classification rather than on the basis of department. Briefly, under the job classification system, when an overtime position existed in a driving position, the assignment was initially offered to all truck drivers sequentially in order of the driver with the lowest accumulated overtime before being offered to a truck helper. Similarly, when an overtime helper vacancy

7. Plaintiffs' Exhibit No. 3.

arose, it was first offered to all helpers in order of accumulated overtime before being offered to a truck driver. Under a departmental method, an overtime vacancy would be first offered to the employee within the department having the lowest accumulated overtime irrespective of the nature of the overtime assignment and the job classification of the employee.

Plaintiffs contend that a denial of overtime work for helpers obtained from this system. At first blush, this effect is not apparent; the job classification system appears *quid pro quo*, giving preference to drivers in overtime driving assignments and preference to helpers in overtime helper assignments. Evidence introduced by Monsanto, however, indicated that the change from departmental to job classification overtime allotment in all probability reduced the overtime opportunities available to helpers, although the extent of this reduction is unclear. It was, and apparently remains, Monsanto's practice to assign helpers to assist drivers on overtime only where demonstrable need exists. More drivers would be needed than helpers, and as a practical effect the job classification system would reduce overtime opportunities for helpers. The corollary to reduced overtime opportunities for helpers would be increased overtime opportunities for drivers and the dispatcher.

This, in and of itself, however, falls short of establishing a prima facie case of discrimination under Title VII with respect to either the class or Hebert's individual complaint. To the extent that these actions fall into the category of Title VII cases governed by the rule of *Griggs v. Duke Power Co., supra*, plaintiffs have failed to establish that the system of overtime allotment complained of has an adverse disproportionate impact upon black employees. Clearly, when the system was implemented in 1970, its adverse consequences, if any, were felt only by black employees, since all nine help-

ers at that time were black. It is equally apparent that the three white employees in the department at that time stood to benefit from the change in overtime allotment. Nevertheless, the majority of black employees in the department also stood to benefit equally with whites, since the majority of blacks in the department in 1970 were employed as drivers. Upon these facts, a prima facie case of disparate racial impact has not been established. No showing has been made that the challenged provision alloted overtime in a significantly discriminatory pattern. *See, e.g., Dothard v. Rawlinson, supra* [433 U.S.] at 329 [97 S.Ct. at 2726]; *Griggs, supra* [401 U.S.] at 432 [91 S.Ct. at 854], *Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1257 (6th Cir. 1981); *Smith v. Olin Chemical Corp.*, 555 F.2d 1283, 1286–87 (5th Cir. 1977).[8]

Nor, when viewed as a case of disparate treatment, have plaintiffs sustained their prima facie burden of showing an employment decision from which, if unexplained, an inference of unlawful discriminatory intent can be drawn. The decision at issue to some degree may have favored truck drivers over truck helpers in the overall allotment of overtime work, and for present purposes the Court presumes such was its intended effect. The Court also presumes that defendants were cognizant of the racial composition of the trucking department in 1970. Almost certainly, defendants knew or should have known, at the time the decision was made, that all truck helpers were black. Similarly, defendants would have known that a majority of truck drivers were black, and, indeed, that a majority of black employees in the truck department were drivers. Under these circumstances, a decision favoring truck drivers does not justify an inference of racial discrimination, and plaintiffs introduced no additional evidence to show that the decision proceeded from an intention to treat black employees

---

**8.** The Court has reached its conclusion based upon consideration of the disparate impact the overtime allotment system had on blacks with respect to all overtime work in the truck department. Were it to consider the disparate impact of this system solely with respect to overtime driving assignments, the result would be no different. In either case, the requisite showing has not been made.

within the department less favorably on account of race.[9]

2. *The Utilization of Truck Helpers on Overtime.* Plaintiffs urge an additional claim of discrimination arising out of Hebert's EEOC charge not directly related to the utilization of the classification system of overtime assignment. Plaintiffs allege that, at a time when truck drivers were all or predominantly white, Monsanto routinely assigned helpers to assist truck drivers on overtime and that Monsanto discontinued the routine overtime assignment of helpers when the majority of truck drivers within the department became black. Plaintiffs produced no credible evidence in support of this contention. Defendants, on the other hand, introduced evidence to show that the issue of assigning truck helpers on overtime had long been a source of contention between employees in the truck department and Monsanto. The evidence presented by Monsanto shows that as early as 1954, when all truck drivers were white, grievances had been lodged by drivers complaining that the company should routinely assign helpers to them on overtime. Monsanto, however, has consistently maintained a policy of assigning truck helpers on overtime only when the necessity for such assistance is established. In sum, a preponderance of the evidence fails to sustain the plaintiff's contention that Monsanto has treated black truck drivers differently from white truck drivers in failing to provide helper assistance during overtime work, or that Monsanto has otherwise discriminated in the assignment of overtime work to any black employee in the trucking department.

## B. *Section 1981 Class Claims*

Much of the evidence introduced by plaintiffs at trial in support of individual and class claims under 42 U.S.C. § 1981 concerns alleged discriminatory employment practices predating the relevant time frame of this action, that is, prior to October 1, 1972. Relying upon *United Airlines, Inc. v.*

*Evans,* 431 U.S. 553, 558 [97 S.Ct. 1885, 1889, 52 L.Ed.2d 571] (1977), defendants correctly observe that such evidence, separately considered, is demonstrative only of "unfortunate events in history" with no present legal consequences. Defendants concede, however, that evidence of alleged discriminatory acts not made the basis of a timely lawsuit may still constitute relevant background in a proceeding in which the status of current practices are in issue. Certainly, in a case such as this, where plaintiffs allege long-lived discriminatory practices and policies, such evidence bears careful attention.

It is undisputed that until 1959 Monsanto maintained segregative hiring, transfer and promotion policies at its Texas City plant. Blacks were hired only into less remunerative, less responsible positions in the labor and service departments. Higher paying semi-skilled, skilled, and supervisory positions were reserved exclusively for whites. There were no blacks in the management ranks at Monsanto.

In 1959, Monsanto committed to a "gradual and planned program of integration." It was not until 1963–64 that Monsanto first hired and promoted blacks into formerly all white job classifications, including the company's operator trainee and craft apprentice programs. According to EEOC findings, between the years 1963–1970 43 blacks, approximately 28% of the black work force at Monsanto in 1970, was either hired or promoted into job categories previously reserved for whites. As of 1970, there were approximately 950 employees in these categories. During the same period, three whites were hired or transferred into the previously all black labor craft and service departments, which in 1970 consisted of approximately 150 employees.

From 1965 to 1972, the work force at Monsanto's Texas City plant dropped by 281 employees. Further, the plant was under a hiring freeze from 1970 to 1974. As the Court understands the significance of this

---

**9.** Indeed, Albert Pollitt, a class member who displaced Hebert as Union steward in the truck department in 1970, testified that a majority of the truck drivers in the department desired the change.

freeze, no new jobs were created during this time. Thus hirings, promotions, and transfers of employees occurred only when a vacancy arose. In a number of instances, Monsanto determined to leave vacancies unfilled, resulting in further attrition of the work force at the plant, including reductions in the number of employees in several of the maintenance crafts. During this time period, however, 47 promotions were made into the maintenance crafts and operations. Better than 80% of these promotions went to black employees.[10]

A document prepared by Monsanto entitled "Affirmative Action Compliance Program for Calendar Year 1973," introduced as part of Plaintiffs' Exhibit No. 1, indicates that as of December 31, 1972, minority representation (including but not limited to blacks) in the listed occupational categories at Monsanto's Texas City plant was as follows:

| | |
|---|---|
| Category I. | Officials & Managers -- 1.6% minority |
| Category II. | Professionals -- 6.2% minority |
| Category III. | Technicians -- 3.0% minority |
| Category IV. | Sales Employees -- 0% minority |
| Category V. | Office & Clerical -- 10% minority |
| Category VI. | Craftsmen -- 5% minority |
| Category VII. | Operators -- 26.0% minority |
| Category VIII. | Laborers -- 89.0% minority |
| Category IX. | Service Workers -- 76.0% minority [11] |

At the conclusion of 1972, minorities accounted for 12.4% of the total work force.

Monsanto estimated that minority population within commuting distance of its Texas City plant was approximately 19% black and 4% Hispanic. The 1970 census indicated that the total black population in Galveston County was 19.7%.

*1. Discriminatory Hiring Practices.* The gravamen of this section 1981 complaint is that Monsanto has maintained a policy of hiring blacks to less remunerative and unskilled positions, while excluding blacks from semi-skilled and skilled job classifications. Plaintiffs contend that the minority employment percentages contained in Monsanto's Affirmative Action Compliance Program for 1973, *supra,* considered in light of the total black population in the Galveston-Texas City area as of 1970 is strong evidence that Monsanto has engaged in discriminatory hiring practices. The Court cannot agree with the plaintiffs' assessment of these statistics.

Certainly, statistical analysis has served and will continue to serve an important role in cases in which the existence of discrimination is a disputed issue. There is, of course, no requirement that a work force mirror the general population, yet statistical evidence of long-lasting and gross disparity between the composition of a work force and that of the general population may be a telltale sign of purposeful discrim-

---

**10.** *See* Defendants' Exhibit Nos. 31 & 32. Prior to the implementation of the bidding system negotiated as part of the *Sanders* settlement, the decision of whom to promote or transfer rested largely on subjective factors. Certainly, seniority alone was not determinative of the employment decisions. Job vacancies were not posted; neither was there any bidding system on vacancies. Employees interested in various positions simply indicated this interest in what Monsanto's counsel appropriately characterized at trial as a "wish book." If a position became available, an employee expressing his interest in the "wish book" might be considered by Monsanto in filling the position. Apparently, however, Monsanto was not required to consider any applicant, or limited only to employees so applying in filling a vacancy. In some instances, the decision of whom to promote was made solely by the head of the department where the vacancy existed. Of course, the Court must carefully scrutinize any such subjective evaluation and selection process, which the Fifth Circuit has repeatedly

held readily susceptible to discriminatory application. *See, e.g., Rowe v. General Motors Corp.,* 457 F.2d 348 (5th Cir. 1972). The use of subjective criteria in employment decisions without more, however, is not violative of Title VII or 42 U.S.C. § 1981. The ultimate issue is whether subjective criteria were used to disguise discriminatory action. *Ramirez v. Hofheinz,* 619 F.2d 442, 446 (5th Cir. 1980).

**11.** As utilized here, "craftsmen" refers to maintenance craft journeymen and leadmen, and also includes operators. Generally, these positions are referred to in this opinion as skilled positions. "Operatives" are referred to as semi-skilled positions, and include maintenance craft and operator apprentices, laboratory analysts, truck drivers and dispatchers, and pumper gaugers. Foremen are included in the category of "Officials and Managers;" leadmen in the various crafts, groups and departments are not.

ination. Absent explanation, it may ordinarily be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial composition of the population in the community from which employees are hired. *Teamsters, supra* [431 U.S.] at 339–40 & n.20 [97 S.Ct. at 1856 & n.20].

Like any other kind of evidence, however, the usefulness of statistics depends on all the surrounding facts and circumstances. *Id. See, e.g., Hester v. Southern R. R. Co.,* 497 F.2d 1374, 1379–81 (5th Cir. 1974). While plaintiffs' statistics speak to an extended period of time, *i.e.,* 1944 to 1972, only a few months fall within the period covered by this lawsuit. The Court could easily infer from the statistics relied upon by plaintiffs that Monsanto had engaged in discriminatory hiring practices at some time in the past. It is undisputed in the record that for many years prior to the enactment of Title VII, Monsanto maintained openly discriminatory hiring policies with respect to blacks. It is also clear that Monsanto did not hire black employees into semi-skilled and skilled positions until at least 1963. Plaintiffs' initial burden, however, is to establish a prima facie case of discrimination during the period of time actionable in this lawsuit. As the Supreme Court cautioned in *Hazelwood School Dist. v. United States,* 433 U.S. 299, 309 [97 S.Ct. 2736, 2742, 53 L.Ed.2d 768] (1977), an employer who from the effective date of Title VII forward made all hiring decisions in a nondiscriminatory manner would not have violated Title VII even if it had formerly maintained an all-white work force by purposefully excluding blacks.[12]

Apparently, plaintiffs rely upon Monsanto's Affirmative Action statistics for the inference that the company maintained discriminatory hiring policies not only from 1963 to 1972, but during the relevant time period of this action as well. The probative value of these statistics as evidence of such discrimination, however, is limited. The fact that as of December 31, 1972, the percentage of minority employees in unskilled positions remained relatively high, while the percentage of minority employees in semi-skilled and skilled positions was comparatively meager, although evidence of discrimination, is not prima facie evidence of discrimination between 1963 and 1972. The Court cannot discern from these statistics the number of job applicants who were hired into semi-skilled and skilled positions between 1963 and 1972, nor what percentage of these hires were blacks. Neither can the Court discern the number of job applicants who were hired in labor and service positions by Monsanto during this time, nor the percentages of these hires that were black. *See James v. Stockham Valves & Fittings Co.,* 559 F.2d 310, 323–24 (5th Cir. 1977).[13]

Moreover, with respect to skilled craft positions which require qualifications not ordinarily possessed by the general citizenry, plaintiffs' reliance on comparisons to the general population rather than a smaller pool of qualified individuals is problematic. *Hester v. Southern R. R., supra,* at 1379. Again, in a situation in which less than 5% of Monsanto's craftsmen were black, comparison to the general population is logical-

---

**12.** For purposes of this action under 42 U.S.C. § 1981, an employer who during the time period relevant to a section 1981 action made all hiring decisions in a nondiscriminatory manner would not violate that statute even if during the preceding time period it had purposefully discriminated against blacks. *See United Air Lines v. Evans, supra.* Of course, proof of discriminatory practices continuing up to the eve of the time period covered by a section 1981 action, although void of present legal consequences, might illuminate current practices which, viewed in isolation, do not indicate discriminatory motives. *Crawford v. Western Electric Co., supra,* at 1314, 1317 n.31.

**13.** The EEOC calculated the number of blacks either hired or promoted into such positions between 1963 and 1970, but did not calculate the total number of hirings and promotions into these positions. During this same time period the total number of employees at Monsanto's Texas City plant shrunk by more than 200. Missing here is the comparative data of the number of whites hired into these positions between 1963 and 1972, which the Supreme Court in *Teamsters* found compelling evidence of discrimination. *See* 431 U.S. at 341 & n.21 [97 S.Ct. at 1857 & n.21].

ly relevant and is some evidence of discrimination. Nevertheless, proper identification of the relevant labor market is particularly important, and may often determine whether a plaintiff has established a prima facie case. *Markey v. Tenneco Oil Co., supra,* at 499. *See Hazelwood School Dist. v. United States, supra* [433 U.S.] at 310–11 [97 S.Ct. at 2743]; *Teamsters, supra* [431 U.S.] at 340 n.20 [97 S.Ct. at 1856 n.20]; *Williams v. Tallahassee Motors, Inc.,* 607 F.2d 689, 691–92 (5th Cir. 1979). In light of surrounding facts and circumstances, the Court finds the statistics relied upon by plaintiffs do not evidence the requisite disparity in treatment between 1963 and 1972 from which discriminatory intent can be inferred. *Williams v. Tallahassee Motors, supra* at 691. *See Meloms [Neloms] v. Southwestern Electric Power Co.,* 440 F.Supp. 1353, 1369 (W.D.La.1977); *Bay v. Goodyear Tire & Rubber Co.,* 24 F.E.P. 262 (S.D.Tx.1980); *Pouncy v. Prudential Ins. Co.,* 23 F.E.P. 1349 [499 F.Supp. 427] (S.D.Tx.1980); *United States v. Strickland Transportation Co.,* 17 F.E.P. 1091 (N.D.Tx.1978).

Even were the Court to find that the evidence relied upon by plaintiffs conclusively establishes that Monsanto engaged in discriminatory hiring practices between 1963 and 1972, plaintiffs still could not prevail under this particular section 1981 complaint. While such discrimination might illuminate discriminatory motives underlying challenged hiring practices during the time period covered by this lawsuit, plaintiffs cannot establish a prima facie case of discrimination solely in reliance upon discriminatory actions having no present legal consequences. *United Air Lines v. Evans, supra* [431 U.S.] at 558 [97 S.Ct. at 1889]. Plaintiffs have introduced no statistical evidence from which the Court might infer that Monsanto has discriminated against blacks in hiring decisions subsequent to October 1, 1972, nor evidence of individual instances of alleged discrimination during the period covered by this suit from which, in combination with past discriminatory practices, the Court could infer a pattern or practice of racial discrimination in hiring. Thus, plaintiffs have failed to sustain their prima facie burden under section 1981.

*2. Discriminatory Promotion Practices.* Plaintiffs also rely upon the 1973 employment statistics compiled by Monsanto in support of the contention that defendants have discriminated against black employees in promotions and transfers. As of December 31, 1972, those figures indicate a significant statistical disparity between the percentage of minority employees in semi-skilled, skilled, and supervisory job classifications and the percentage of minority workers in Monsanto's unskilled job classifications. Since Monsanto's policy with respect to the filling of supervisory, skilled and semi-skilled positions during the relevant time period apparently was to promote employees from within rather than hiring laterally from outside the ranks of company employees,[14] the relevant statistical comparison is to the proportion of blacks available for promotion from lower job levels. *Johnson v. Uncle Ben's, Inc.,* 628 F.2d 419, 423, 425 (5th Cir. 1980); *James v. Stockham Valves & Fittings Co., supra,* at 341.

The controversy here focuses principally on two issues: first, the promotion of blacks from lower job levels to available positions into the crafts and craft apprentice programs; and, second, the promotion of blacks to supervisory positions. Monsanto's apprentice programs make it possible for lower level employees who lack the requisite qualifications for journeymen positions in the various crafts to acquire necessary skills. Very few, if any, unskilled workers could otherwise qualify as a journeyman; hence the apprentice programs are the principal avenues available to lower level employees seeking promotion to skilled positions.

Plaintiffs, relying again on Monsanto's Affirmative Action statistics, contend that the appropriate pool of applicants for promotion into the crafts (and operations) and the apprentice programs is 90% black. Plaintiffs argue that the statistical dispari-

---

**14.** *See generally* Plaintiffs' Exhibit No. 1.

ty between this percentage and the percentage of minorities in crafts and operative classifications (Classifications VI and VII in Monsanto's Affirmative Action report) as of December 31, 1972, is such as could not exist in the absence of racial discrimination.

The Court is inclined to agree with plaintiffs that the statistical disparity shown could not have come about in the absence of discrimination. Yet the statistics relied upon by plaintiffs point toward discrimination only at some time prior to 1972. As with plaintiffs' claim of hiring discrimination, the Court cannot infer from this statistical showing alone [15] a prima facie case of discrimination during the time period actionable here. Clearly, no blacks were promoted into the crafts and apprentice programs until 1963. Yet the Court is no more able to glean from the proffered statistics in this instance the overall number of promotions from 1963 forward and the percentage of promotions going to blacks than it was able to determine whether blacks had been underrepresented in hirings into the same positions during this time period.

Moreover, the Court cannot accept plaintiffs' assessment of the percentage of blacks in the available labor pool as an accurate reflection of the evidence. Assuming, as plaintiffs apparently have done, that the pool is comprised *only* of employees in the laborer craft, and utilizing only 1972 statistics, the pool would be 89% *minority*. Yet, even this assumption finds no support in the record. Prior to the *Sanders* consent decree, the available pool for promotions into the apprentice programs would have been comprised of all employees in job classifications whose top rate of pay was less than the top rate in the apprentice positions. This would encompass not only laborers, but all job classifications in the service department and several job classifications in operatives (Classification VII) and office and clerical (Classification V), including stores clerks, truck drivers and truck dispatchers. *See* Defendant's Exhibit No. 18, at pp. 66–67, 82–85; Defendant's Exhibit No. 3.

Using the 1972 statistics relied upon by plaintiffs, the available applicant pool thus would have been 78.5% *minority*. Some percentage of this figure, of course, would reflect minorities other than blacks. Monsanto introduced evidence to show that from 1970 to 1974, 76.2% of all promotions into the crafts and 84.6% of all promotions into operations [16] went to black employees. The Court finds this showing sufficient to rebut any inference of discrimination that might be raised by plaintiffs' statistical offering. Further, Monsanto's evidence remains uncontradicted by plaintiffs, and its credibility unimpeached.

A controversial feature of the *Sanders* consent decree, and one which may have precipitated this lawsuit, was a provision allowing all hourly employees one opportunity to bid laterally or downward into equal or lower paying jobs. This meant, for the first time, that employees in operations, who unlike employees in other departments are required to work rotating shifts, could apply for transfers into craft apprentice programs. Based on 1972 statistics, if *all* hourly employees in operations were included in the available labor pool for promotions into crafts, 23.2% of the applicants would be

---

**15.** In assessing the prima facie strength of this evidence, the Court is mindful that Monsanto's promotion system until 1974 was largely subjective in nature. Refer to note 10 *supra*. However, plaintiffs have presented no statistical evidence from which the Court could directly infer that the subjective selection process resulted in discrimination against blacks during the relevant time period of this action, and, to a limited extent, Monsanto's affirmative action employment policy supports a conclusion that subjective criteria were not used to disguise discriminatory action. *See Ramirez v. Hofheinz, supra*, at 446.

Nevertheless, the Court declined to grant defendants' Rule 41(b) motion at the conclusion of plaintiffs' case-in-chief, and defendants, put to the election, chose to present rebuttal testimony. In assessing the sufficiency of this testimony the Court necessarily assumes the existence of a prima facie case.

**16.** *See* Defendants' Exhibit Nos. 31 & 32. Operations in this instance includes laboratory analysts and pumper gaugers.

minority. Whether this would accurately reflect the composition of the pool after 1974 is debatable, since, *inter alia*, the extent to which employees in operations availed themselves of this opportunity depended on their willingness or ability to accept a reduction in wages. Nonetheless, it is apparent, and plaintiffs do not dispute, that in actual operation the percentage of blacks in the pool for promotions into the crafts was substantially diluted by this provision.

In fact, plaintiffs contend that the very inclusion of this provision in the *Sanders* consent decree discriminates against blacks. Plaintiffs argue that the provision had the effect of reducing significantly the number of blacks receiving promotions into the crafts, particularly since the *Sanders* decree for the first time instituted a job bidding system in which promotions were filled strictly on the basis of bargaining unit seniority.[17] Plaintiffs conclude that such was the effect that the defendants intended when a place for the provision was secured in the *Sanders* settlement.

The testimony of Paul Teague, Union Business Manager who participated in the *Sanders* settlement negotiations, clearly shows that the provision was one of Union origin, strongly sought by the Union although initially opposed by Monsanto and, it would seem, the *Sanders* plaintiffs. There is no evidence, however, that the inclusion of this provision in the *Sanders* decree was motivated by discriminatory purpose, although its effects might easily have been foreseen. According to Teague, the Union's sole concern was with improving the lot of shift workers in operations.

Teague testified credibly to the destructive potential of shift work on an employee's family life, and to his earnest conviction that long-time rotating shift workers willing to take a cut in pay deserved an opportunity to transfer to a position working straight days. While it is clear that the provision was intended for the benefit of longtime employees in operations, most of whom, if not all, were white, nothing in the record otherwise prompts the Court to question Teague's nondiscriminatory explanation for the provision, and plaintiffs have

---

**17.** Because the defendant Metal Trades Council represents all hourly employees for purposes of collective bargaining with Monsanto, the term "bargaining unit" seniority as used here tends to be misleading. Essentially, the seniority system utilized by Monsanto is departmental, as opposed to plantwide. Seniority is determined according to length of service in the craft, group or department to which an employee is presently assigned, and not by the overall length of employment at Monsanto's Texas City plant. Plaintiffs complain of this because blacks initially hired into labor or service were denied the opportunity for promotion or transfer to other areas of the plant until 1963. For bidding purposes, blacks who received transfers or promotions subsequent to 1963 often found themselves disadvantaged against high seniority whites availing themselves of the one-time opportunity to bid laterally or down into a vacancy. In many instances a white employee would possess superior bargaining unit seniority to that of a black employee, even though the latter had greater plantwide seniority. Members of the *Sanders* decree who embraced the consent decree in that lawsuit received remedial seniority and were not so disadvantaged. Members of the present class who refused or were not entitled to such relief were subject to the bargaining unit rule.

It should be noted that plaintiffs raise two distinct but interrelated challenges to the bidding system. The plaintiffs challenge the use of bargaining unit seniority, which they contend perpetuates the effects of past discriminatory practices. The plaintiffs also challenge the lateral or downward bidding provision. While plaintiffs complain about this provision in conjunction with the use of bargaining unit seniority, their complaint is not based solely upon the method used for determining seniority. The first of these challenges clearly goes to the bidding-seniority system, and is subject to the preclusive effect of section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h). Refer to Section III(B)(4), *infra*. In light of the Supreme Court's pronouncements in *California Brewers Assn. v. Bryant*, 444 U.S. 598 [100 S.Ct. 814, 63 L.Ed.2d 55] (1980), the Court is of the opinion that the latter challenge does not go to the seniority aspects of the bidding system. The lateral or downward bidding provision is in no real sense an ancillary rule that accomplishes functions necessary to the operation of the seniority system. *Id.* at 607 [100 S.Ct. at 820]. To prevail on this challenge under 42 U.S.C. § 1981, of course, plaintiffs must still establish discriminatory motive.

made no showing that the proferred explanation was a pretext for discrimination. Thus, the Court finds from the evidence presented at trial that the inclusion of this provision in the *Sanders* consent decree, while certainly unusual, was not unlawful.

There remains for consideration plaintiffs' claim that Monsanto has discriminated against blacks in promotions into supervisory and managerial positions. Promotions into first-line supervisory positions are made principally on the basis of experience or seniority within the particular group or department. Higher level positions are also filled by promotions of employees with many years experience at the plant. Various technical backgrounds are required for such positions.

To establish a prima facie case of discrimination in this regard, it is incumbent upon plaintiffs to show that qualified black applicants for supervisory positions had been passed over for promotions while whites with less experience had been promoted, or by showing that blacks had not moved up the promotions ladder into supervisory positions as quickly as whites. *See, e.g., Crawford v. Western Electric Co., supra.* Plaintiffs, however, continue to rely almost exclusively[18] on Monsanto's Affirmative Action statistics, which reveal that, as of December 31, 1972, 1.6% of Monsanto employees in supervisory positions were minorities. Again, the Court, for the reasons previously set forth, finds these statistics inconclusive evidence of discrimination during the relevant time period.

Further, Monsanto introduced evidence that 11.5% of all supervisory promotions between 1970 and 1981 went to blacks, Defendants' Exhibit No. 11, and testimony that the work force at the plant is presently 11% black. While this statistical showing is not conclusive proof of the absence of discrimination during the relevant time period, it is sufficient to rebut any inference of discrimination that might arise from plaintiffs' statistical offering. The burden of proving discrimination during the relevant time period is upon the plaintiffs, and in this instance that burden has not been met.

The same is true generally of plaintiffs' claims of discriminatory promotion practices during the time period encompassed by this suit. Any inference of purposeful discrimination that might arise from the 1972 statistics relied upon by plaintiffs was rebutted by statistics introduced by Monsanto dealing specifically with promotions during the relevant time period. Those statistics convincingly bolster Monsanto's argument that plaintiffs' evidence is indicative only of discrimination existing sometime in the past, discrimination which does not presently afford plaintiffs any basis for the relief sought. The plaintiffs failed to introduce significant evidence to rebut Monsanto's statistics or otherwise demon-

---

**18.** The only potential individual claim that could bolster plaintiffs' statistical evidence is that of named plaintiff Carl Beard. Beard testified that in 1980 he expressed an interest in two foreman positions, but was told by his present foreman, N. C. Broussard, that he would never be promoted to a supervisory position. Beard admits that he never bid on either position, but apparently feels that applying for either position would have been a futile gesture in light of Broussard's statement, which Beard attributes to racial animus. There would be greater merit to Beard's position if Monsanto's present employee selection process was a subjective one in which the recommendation of the employee's immediate supervisor was largely, if not completely, controlling of the employment decision. *See, e.g., Rowe v. General Motors Corp., supra,* at 359. This, of course, is not the case, although had Beard been the high seniority bidder for either position under the *Sanders'* bidding system, Broussard's opinion as to his qualifications as a supervisor might well have been considered by the Company.

In rebuttal, Monsanto introduced evidence that at least one of the foreman positions in question went to a black employee. The company also introduced evidence that Beard had a poor attendance record to explain Broussard's statement. *See* Defendants' Exhibit Nos. 25, 26 & 33. Beard, in response, testified that one white with a worse attendance record had been promoted to a supervisory position, but this assertion is unsubstantiated in the record, and contradicted by Monsanto. In the final analysis, Beard's claim of discrimination rests entirely upon the contention that Broussard's purported statement was racially motivated, and that Beard, had he applied for either position, would have been denied the promotions on account of his race. This contention is not supported by a preponderance of the evidence.

strate that defendants discriminated against blacks as a class in promotions subsequent to October 1, 1972, and the preponderance of the evidence does not support such a finding.[19]

3. *Discrimination in Apprentice Programs.* Plaintiffs also allege that Monsanto's apprentice programs have been maintained in a discriminatory manner. Monsanto, in coordination with the Union, has maintained federally-approved craft apprentice programs since the 1950's. The apprentice programs require four years for completion. The substance of the requirements for completion are set in the collective bargaining agreement between Monsanto and the Union. Each apprentice must sign an "Apprentice Agreement," and successfully complete on-the-job training and related instruction courses.

On-the-job training consists of 8,000 hours of training in specific areas of craft knowledge and testing over these areas administered jointly by Monsanto and craft unions. The training is divided into eight levels, and apprentices must pass an on-the-job test, drafted by the apprentice representative and craft supervisor, before advancing to the next level of training. Should an apprentice fail a test, he or she retakes the test within 30 days. Failure of the second examination may result in termination from the apprentice program. The tests administered pursuant to the on-the-job training have not been "validated" under EEOC Uniform Guidelines on Employee Selection Procedure, 29 C.F.R. § 1607 (1980).

Apprentices must also successfully complete 144 hours of related instruction in courses such as apprentice math, chemistry, blueprint reading, and craft knowledge. Since 1969, related training courses have been conducted under the auspices of the College of the Mainland (COM) at Texas City. The COM programs are utilized by the various companies in the Texas City area, and while it appears from the testimony at trial that the companies and the Union have some input into this process, the courses are designed and administered by COM. Testing in these courses is the responsibility of the college, as is the determination of who passes and who fails. The COM tests have not been validated.

Subsequent to the *Sanders* decree in 1974, seven blacks bid into the apprentice programs. Only two successfully completed the program. Three of the black employees who failed their apprenticeships—Harold Jones, Cornell Nealy, and I. G. Green—are members of the instant class. Jones failed the on-the-job portion of the program, and a pre-apprentice math course at COM. Nealy and Green failed the related instruction courses at the College.

Relying largely upon the testimony of these individuals and another black employee, Joseph Mouthon, who successfully completed the program, plaintiffs contend that the related instruction programs are not sufficiently job related, and that this requirement, in conjunction with tests administered in on-the-job training, has the effect of discriminating against blacks and has been maintained for discriminatory reasons.

19. In addition to Beard's individual claim, refer to note 18, *supra*, named plaintiffs assert only two individual claims of discrimination during the relevant time period. Willie Nixon complained that he bid for a pumper gauger position which was filled by a white employee. Nixon conceded under cross-examination, however, that under the *Sanders* bidding provision, the employee selected for the position was the one with the greatest bargaining unit seniority. Nixon's complaint is with the bidding system's use of bargaining unit seniority rather than plant-wide seniority, and that issue is disposed of in Section III(B)(4), *infra*.

Samuel Hebert testified that prior to the implementation of the *Sanders* bidding system, in approximately 1972–73, he applied for a pipefitter apprentice position, but was not promoted to that position. Hebert, however, failed to make a prima facie showing of discrimination. Adjusting the *McDonnell Douglas* criteria in the context of a promotion case, a prima facie showing would require, at a minimum, proof that Hebert applied for the promotion, and that non-black employees of similar qualifications were indeed promoted at the time that Hebert's request for promotion was denied. *See Bundy v. Jackson, supra,* at 951. *See also Olafson v. Dade County School Board,* 651 F.2d 393, 394 (5th Cir. 1981). Hebert failed to make this showing.

The plaintiffs point prominently to the lack of evidence indicating that any white employee has ever failed the apprentice program.

With the exception of Ankles Allen, who failed to complete the on-the-job training as an operator trainee in 1970,[20] there is no evidence that other black employees entering the apprentice programs have failed to complete them. Named plaintiffs James Earls and Carl Beard, for example, successfully completed such programs. There is no evidence that any of the 12 minority employees out of the 26 employees who were in the apprentice programs as of December 31, 1972, failed to complete the training, or that any of the seven blacks in the apprentice programs in 1973 failed to complete the training. Finally, from 1970 to 1980 61.5% of all promotions into crafts went to blacks. Defendants' Exhibit No. 31. From this evidence, the Court cannot find that as a result of the on-the-job testing and related instruction, blacks failed to complete the apprentice programs in a significantly discriminatory pattern. *Dothard v. Rawlinson, supra.*

With respect to the related instruction courses in connection with the boilermaker apprentice programs, from which Messrs. Nealy and Green were failed, J. A. Anderson, a boilermaker craft foreman at Monsanto, testified that the areas of knowledge covered and tested by the COM courses are job-related and reasonably necessary to boilermaker journeymen. Green failed to pass the apprentice math course at the college, twice failing the examination. Nealy failed blueprint reading. Anderson testified that the mathematical and arithmetic functions tested in a representative examination given by the college, Defendants' Exhibit No. 35, are functions necessary to boilermaking work. This testimony is largely unrebutted. While plaintiffs established that problems which called for apprentices to retain from memory and use certain geometric formulas were not strictly necessary, since boilermaker journeymen on the job could refer to a book for such

formulas, it remains true that journeymen must recognize the formulas and know how to apply them. Plaintiffs can scarcely question the necessity of blueprint reading to the boilermaker position. In sum, the Court finds no evidence that the challenged related instruction was not job related, or was otherwise a pretext for discrimination.

There is no evidence of any purposeful or intentional racial discrimination, or that race was a factor in the termination of Messrs. Jones, Nealy and Green from the apprentice programs. In fact, there is undisputed evidence that defendants, after being apprised of the difficulties that the black apprentices were having with related instruction, made efforts to assist these individuals never before made for apprentices. Remedial training in math and English was provided by Monsanto. Monsanto also hired a tutor to assist the black apprentices, and his services were provided at the plant partly on company time. Monsanto and the Union also made other employees available on company time to assist the apprentices.

Finally, there is no evidence that whites were afforded favorable treatment over blacks in the apprentice programs. While plaintiffs contend that whites were routinely given more credit time against the four-year program than blacks, this contention is not supported by credible evidence. Plaintiffs have failed to establish any claim of racial discrimination in the creation and maintenance of the apprentice programs.

Monsanto discontinued the use of craft apprentice programs in 1977 as a vehicle for filling openings in the maintenance crafts, and craft openings are now filled by lateral hiring from outside the plant. Plaintiffs allege that this decision was motivated by invidious racial considerations. There is unrebutted testimony in the record, however, that subsequent to the implementation of the *Sanders* bidding provisions, an increasing number of craft apprentice positions went to high seniority white operators bidding laterally or downward into such posi-

---

**20.** At that time Monsanto had yet to implement a true apprentice-program in operations.

tions. Plaintiffs do not dispute this; in fact, a majority of the class members who testified at trial expressed their dissatisfaction with the *Sanders* bidding system for this reason.

Monsanto contends that it discontinued the craft apprentice programs and resorted to lateral hiring in an effort to increase black representation in the crafts. While there is no evidence to discredit this proferred explanation, it strikes the Court that Monsanto may have been equally, if not more, concerned with the attrition of experienced operators transferring into the craft apprentice programs. Nevertheless, the Court can draw no inference of purposeful discrimination from this evidence, nor have plaintiffs introduced evidence that Monsanto has discriminated against blacks in the hiring of craftsmen since 1977.

*4. The Seniority System.* Section 703(h) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h) exempts from Title VII attack seniority systems that apply different standards of compensation or different terms, conditions or privileges of employment to employees, provided that such differences are not the result of an intention to discriminate because of race. When this lawsuit was commenced in 1974, the prevailing judicial interpretation of section 703(h) was that seniority systems which operated to freeze the effect of prior discriminatory employment practices nonetheless violated Title VII. *See, e.g., Quarles v. Phillip Morris, Inc.,* 279 F.Supp. 505 (E.D.Va.1968). Subsequently, the Supreme Court in its landmark 1977 decision in *Teamsters* held that Congress enacted section 703(h) to ensure that the routine application of a bona fide seniority system would not be unlawful under Title VII even where it perpetuated the effects of pre-Act discriminatory practices. 431 U.S. at 352 [97 S.Ct. at 1863]. In the same term, the Court extended this holding to preclude challenges to seniority systems that perpetuated the effects of post-Act discriminatory practices not made the subject of a timely complaint. *United Air Lines v. Evans, supra,* at 558 [97 S.Ct. at 1889].

In this instance, the gravamen of plaintiffs' challenge to the bidding system's utilization of bargaining unit seniority [21] clearly is that it serves to perpetuate the effects of time barred discriminatory practices. To sustain this challenge, plaintiffs must first demonstrate that the bidding-seniority system is not bona fide, that is, that it has been created and maintained with the intention to discriminate on account of race. *Terrell v. United States Pipe & Foundry Co., supra,* at 1116. Otherwise, the instant complaint is actionable neither under Title VII or 42 U.S.C. § 1981. *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157 (5th Cir. 1978), *cert. denied,* 439 U.S. 1115 [99 S.Ct. 1020, 59 L.Ed.2d 74] (1979).

In determining whether the bidding-seniority system stems from nondiscriminatory motivations, this Court is guided by the four factors extracted by the Fifth Circuit from the Supreme Court's *Teamsters* opinion, and set forth in *James v. Stockham Valves & Fittings Co., supra,* at 352:

(1) Whether the seniority system operates to discourage all employees equally from transferring between seniority units;

(2) whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice);

(3) whether the seniority system had its genesis in racial discrimination; and

(4) whether the system was negotiated and has been maintained free from any illegal purpose.

After weighing the relevant evidence in this case under these factors, the Court finds that the bidding-seniority system is bona fide. With respect to the third *James* factor, it appears that seniority has always been determined at Monsanto's Texas City plant on the basis of length of service in the various bargaining units, rather than on the basis of plant-wide service. Thus, bargaining unit seniority was utilized during an era when blacks were clearly victims of discrimination. The challenge made here, how-

21. Refer to note 17 *supra.*

ever, is to the utilization of bargaining unit seniority to determine who was promoted or transferred. This challenge is to the bidding-seniority system created as part of the *Sanders* settlement. The evidence establishes that this system was negotiated and has been maintained free from any illegal purpose.

With respect to the second *James* factor, the Metal Trades Council represents all hourly employees at Monsanto for collective bargaining purposes,[22] and hence for these purposes there is essentially but one bargaining unit. The so-called "bargaining unit seniority" structure at Monsanto, however, is typical of that in the industry, and is not unlike that challenged in *Teamsters.* Finally, with respect to the first *James* factor, the system *sub judice* does not contain the "suicide seniority" or "lock in" provisions that the Fifth Circuit has so often found strong evidence of discriminatory intent. *See, e.g., Terrell v. United States Pipe & Foundry Co., supra,* at 1118–19. Defendants' Exhibit No. 18, at pp. 25–26.[23]

### IV.

Having considered the totality of the evidence presented at trial, the Court finds that plaintiffs have failed to establish their individual and class claims of discrimination under Title VII and section 1981 by a preponderance of the evidence. Accordingly, the Court has no occasion to consider the relief requested by plaintiffs individually and on behalf of the class. Defendant Union, however, now urges that it is entitled to relief in the form of an award of attorneys fees as a prevailing party under 42

U.S.C. § 2000e–5(k) and 42 U.S.C. § 1988. *See* Defendant Texas City Metal Trade Council's Brief in Support of Judgment, at pp. 47–49.

The Supreme Court has held that federal courts may assess attorneys fees against a Title VII plaintiff only upon a finding that his claim of discrimination was groundless, without foundation, or vexatious. More is required than the simple fact that the plaintiff has ultimately lost his case. *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 419–20 [98 S.Ct. 694, 699, 54 L.Ed.2d 648] (1978). The Fifth Circuit has also applied the *Christiansburg* standard in connection with awards of attorneys fees in section 1981 cases authorized by 42 U.S.C. § 1988. *Crawford v. Western Electric Co., supra,* at 1321. Defending in this lawsuit may have proved costly to the Union. Nevertheless, it is not entitled to recover attorney's fees under the standard announced in *Christiansburg.* [24]

For the reasons set forth above, it is ORDERED, ADJUDGED and DECREED that plaintiffs take nothing, and this action be dismissed on the merits. Taxable costs of court, if any, shall be borne by the parties respectively.

DONE this the 2nd day of September, 1981, at Galveston, Texas.

### EXHIBIT A

### MEMORANDUM AND ORDER

### INTRODUCTION

This is an employment discrimination case brought pursuant to Title VII of the

---

**22.** *Ibid.*

**23.** By 1970, any such objectionable features attendant to the use of bargaining unit seniority had been eliminated by the collective bargaining process.

**24.** Because the thrust of plaintiffs' trial evidence is directed toward Monsanto, the Union suggests it should never have been a party to this lawsuit. The Union overlooks the fact that it was the central figure in the inclusion of the lateral or downward bidding provision in the *Sanders* consent decree. The inclusion of that provision in the settlement of a class action discrimination suit such as *Sanders* was, to say the least, unusual, and in the absence of a

credible explanation, unavoidably suspect. Were the Court convinced from the evidence that the Union's actions had been motivated by invidious racial considerations, neither the acquiescence of the *Sanders* plaintiffs nor Judge Noel's approval of the consent decree would relieve the Union of liability under 42 U.S.C. § 1981 in the present action.

The Union also overlooks evidence introduced by defendants at trial in asserting that the failure of named plaintiff Robert May to testify is significant indication of the "patently frivolous" nature of plaintiffs' case against the Union. By all appearances, Robert May died in June of last year. Defendants' Exhibit No. 1.

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* (1978); and 42 U.S.C. § 1981 (1974); by five black males, Samuel Hebert, Willie Nixon, Robert May, James Earls, and Carl Beard, against Monsanto Company, Texas City, Texas, Metal Trades Council (AFL–CIO), and Local 347 International Union of Operating Engineers (Local 347).[1] Plaintiffs have also brought this action pursuant to Fed.R.Civ.P. 23(b)(2) on behalf of all others similarly situated, and they seek a permanent injunction, declaratory relief, back wages and lost seniority.

Before the Court are Plaintiffs' Motion to Redefine the Class and Defendants Monsanto and AFL–CIO's Motions to Limit the Issues which plaintiffs may raise in their Title VII cause of action. Plaintiffs' Motion to Redefine the Case will be granted and Defendants' Motion to Limit Issues will be granted in part and denied in part. Because the procedural history of this case is important to the determination of plaintiffs' motion to redefine the class, a short summary of that history follows.

PROCEDURAL HISTORY

This is an old case, filed October 1, 1974, which arose as a result of a consent decree entered in another employment discrimination case against Monsanto, *Sanders, et al. v. Monsanto, et al,* Civil Action No. 71–G–211. The consent decree in *Sanders* awarded plaintiffs, and the class they represented, injunctive relief and back pay, and it provided that members of the affected class who objected to the settlement of the case could be excluded from the class and dismissed without prejudice. Plaintiff Hebert and 39 others "opted out" of the *Sanders* action, and the instant suit was filed.

Plaintiffs timely moved for certification of a class consisting of all black employees who were excluded from *Sanders.* Judge James Noel, then presiding in this Court, conducted a certification hearing on February 24, 1975 and considered the certification of three subclasses:

1. Local 347 was dismissed with prejudice on March 31, 1975.

2. The consent decree in *Sanders* expressly excluded persons hired after June 4, 1963 in view

(1) Those persons who were within the class certified in *Sanders*, but who elected to opt out;

(2) Those persons hired by Monsanto after June 4, 1963, and who were expressly excluded from the *Sanders* class;[2] and

(3) Those persons who might apply for hiring with Monsanto in the future.

After the certification hearing, Judge Noel conditionally certified the following class pursuant to Rule 23(b)(2), Fed.R. Civ.P.:

(1) All black employees of Monsanto Company hired on or after June 4, 1963; and

(2) All blacks who apply for employment with Monsanto Company in the future.

Judge Noel specifically declined to certify a subclass consisting of those persons who were within the class certified in *Sanders* but who elected to opt out on the basis that res judicata, or in the alternative, the failure to satisfy the statutory requirements of Rule 23 precluded class certification. In accordance with their right at that time, plaintiffs appealed Judge Noel's certification order.

The Court of Appeals for the Fifth Circuit in *Hebert v. Monsanto Company,* 576 F.2d 77 (5th Cir. 1978) reversed and remanded, holding that the Court "erred in its dismissing the class action based upon a res adjudicata affect of the first class action," and "that the Rule 23 criteria for class certification were satisfied." *Hebert v. Monsanto, supra* at 79. On petition for rehearing, the Court of Appeals vacated its prior opinion and dismissed the appeal for want of jurisdiction because of the intervening United States Supreme Court decision in *Gardner v. Westinghouse Broadcasting Co.,* 438 U.S. 478 [98 S.Ct. 2451, 57 L.Ed.2d 364] (1978) (holding that an order

of plaintiffs' determination that defendants did not discriminate after that date (Memorandum and Order of Judge Noel, April 15, 1976, p. 1).

denying class certification is not appealable). *Hebert v. Monsanto Company*, 580 F.2d 178 (5th Cir. 1978) (per curiam).

Plaintiffs then filed their motion to redefine the class. While the appeal was pending, defendants filed their motion to limit the issues which can be raised by plaintiffs under Title VII.

## MOTIONS BEFORE THE COURT

### A. *Plaintiffs' Motion to Redefine the Class*

Plaintiffs seek the certification of the subclass excluded by Judge Noel and argue (1) res judicata does not apply, and (2) the requirements of Fed.R.Civ.P. 23 are satisfied. Essentially, plaintiffs adopt the reasoning of the Court of Appeals decision which was vacated.

Defendants oppose the motion and contend (1) Judge Noel's conditional certification of the class is the "Rule of the Case" and cannot consistent with judicial comity be changed by this Court, and (2) the vacated panel opinion of the Court of Appeals for the Fifth Circuit has no precedential value and should be given no consideration by this Court.

Defendants' motion raises the issue of whether one District Judge may redefine a class conditionally certified under Rule 23(b)(2) by another Judge of the same court who no longer is a member of the Court? The Court must answer in the affirmative.

Clearly, Judge Noel could have redefined the class. Rule 23(c)(1), Fed.R.Civ.P. provides:

(1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.

Since Judge Noel could have redefined the class, there is no reason why this Court cannot do so.

As to defendants' contention that the doctrine of the rule of the case precludes this Court's redefinition of the class, Judge Stern's discussion in *Zenith Laboratories,*

*Inc. v. Carter-Wallace, Inc.*, 64 F.R.D. 159, at 164 (N.J.1974), affirmed, 530 F.2d 508 (3rd Cir. 1976), is directly on point:

While this Court is in agreement that in ordinary litigation the doctrine of Rule of the Case is a salutary one, resulting in desirable continuity and preventing the continual relitigation of contested points during the course of a suit, it is equally clear that where courts are placed under a continuing duty by Rule 23 to monitor the cases and to review the class determination previously made, the doctrine of the Rule of the Case does not apply.

This is spelled out in the language of Rule 23(c)(1) cited above which states: "An order under this subdivision may be conditional, and *may be altered or amended* before the decision on the merits." (Emphasis added) Presented with the amended complaint, or even without such amendments, the prior judge had a right to review his prior determination as to class. The reassignment of the cause to a new judge for administrative convenience does not insulate the prior determination from a review which the Rules themselves require.

See 1 Newberg, *Class Actions*, § 2192 (1977) and cases cited therein.

Satisfied with the Court's power to redefine the class, the next question presented is whether the subclass proposed meets the requirements of Rule 23(a) and (b)(2). The Court is of the opinion that it does. The class is sufficiently numerous that joinder of all members is impracticable; there are questions of law or fact common to the class; the claims of the plaintiff are typical of the claims of the class; and the plaintiffs will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a); see *East Texas Motor Freight System, Inc. v. Rodriguez, et al,* 431 U.S. 395 [97 S.Ct. 1891, 52 L.Ed.2d 453] (1977); *Carr v. Conoco Plastics,* 423 F.2d 57 (5th Cir. 1970), *cert. denied,* 400 U.S. 951 [91 S.Ct. 241, 27 L.Ed.2d 257] (1970); *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122 (5th Cir. 1969); *Vuyanich v. Republic Natl. Bank of Dallas,* 78 F.R.D. 352 (N.D.Tex.1978).

For the foregoing reasons, the Court concludes that plaintiff's Motion to Redefine the Class should be granted and the following subclasses conditionally certified pursuant to Rule 23(b)(2), Fed.R.Civ.P.:

(1) All blacks who were within the class certified in *Sanders*, but who elected to opt out;

(2) All black employees of Monsanto Company hired on or after June 4, 1963; and

(3) All blacks who apply for employment with Monsanto in the future.

### B. *Defendants' Motion to Limit the Issues*

Defendants have moved to limit the issues which plaintiffs may raise in their cause of action under the Civil Rights Act of 1964, Title VII. They allege (1) no issues may be raised by plaintiffs Nixon, Earls, May and Beard because they did not file any charges with the EEOC, and (2) the judicial complaint contains allegations which are beyond the scope of Hebert's charge filed with the EEOC, and Hebert may raise only those issues raised by him in his charge with the EEOC and investigated by the EEOC.[3]

Defendants' contention that plaintiffs Nixon, Earls, May and Beard may raise no issues is without merit. "It is not necessary that members of the class bring a charge with the EEOC as a prerequisite to joining as co-plaintiffs in the litigation. It is sufficient that they are in a class and assert the same or some of the issues." *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 499 (5th Cir. 1968); *Miller v. International Paper Co.*, 408 F.2d 283, 284–5 (5th Cir. 1969). In the case *sub judice*, plaintiff Hebert filed a charge with the EEOC. Therefore, the Court concludes that plaintiffs Nixon, May, Earls and Beard may remain in the case as plaintiffs. Their Title VII action, however, is confined to the issues Hebert may assert. "[T]he issues that may be raised by plaintiff [Hebert] in such a class action are those issues that he has standing to raise (i.e., the issues as to which he is aggrieved, . . .) and that he has raised in the charge filed with the EEOC pursuant to § 706(a)." *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496 (5th Cir. 1968).

This raises defendants' second contention, that plaintiffs' judicial complaint contains allegations which are beyond the scope of Hebert's charge with the EEOC, and therefore, outside the jurisdiction of this Court.

The Court's determination of what issues may be raised by plaintiffs in their Title VII cause of action is controlled by the charge filed by plaintiff Hebert with the EEOC. The rule was stated in *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, at 466 (5th Cir. 1970):

> [A]llegations in a judicial complaint filed pursuant to Title VII may encompass any kind of discrimination *like or related to* allegations contained in the charge and *growing out of such allegation* during the pendency of the case before the Commission." [*King v. Georgia Power Co.*,] 295 F.Supp. [943] at 941 [947]. In other words, the "scope" of the judicial complaint is limited to the "scope" of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. (Emphasis added)

Contrary to defendants' contention that a plaintiff may raise only the issues raised in the charge filed with the EEOC and investigated by the EEOC, a plaintiff may raise issues in his judicial complaint which were not investigated by the EEOC so long as the issues are like or related to the allegations in the charge, or could reasonably be

---

3. In their motions to limit the issues, defendants also allege that plaintiffs can only adequately represent class members allegedly discriminated against in the exact manner in which plaintiffs allege to have been discriminated against. This argument is directed at plaintiffs' ability to be adequate class representatives under Rule 23, Fed.R.Civ.P., and is without merit. As persons aggrieved, plaintiffs may represent victims of the same policies, whether or not all have experienced discrimination in the same way. *Long v. Sapp*, 502 F.2d 34, 43 (5th Cir. 1974); *Carr v. Conoco Plastics*, 423 F.2d 57, 65 (5th Cir. 1970); *Johnson v. Georgia Highway Express*, 417 F.2d 1122, 1124 (5th Cir. 1969); *Vuyanich v. Republic Natl. Bank of Dallas*, 78 F.R.D. 352, 357 (N.D.Tex. 1978).

expected to grow out of the charge of discrimination. *Gamble v. Birmingham Southern RR Co.*, 514 F.2d 678, 688 (5th Cir. 1975); *Vuyanich v. Republic Natl. Bank of Dallas*, 409 F.Supp. 1083, 1089 (N.D.Tex. 1976).

Plaintiff Hebert's charge with the EEOC stated:

> The company, the Teamsters Local 968 and the Texas Metal Trades Council are parties to a discriminatory provision in the new (May 1, 1970) Articles of Agreement. This provision provides that overtime in the trucking dept. shall be allotted on the basis of classification rather than department. This is discriminatory because it excludes Truck helpers from an equal share of the overtime given to the drivers while including the white dispatcher. Truck helpers are all black. To the best of my knowledge overtime is given on the basis of department in the other departments. Truck driver classification is now changed from white to black. White drivers had helpers on overtime work all the time. Black drivers do not, thereby cutting out overtime for black truck helpers. The Union knows this and does nothing.

Plaintiffs, in their judicial complaint, make an "across the board" attack on discrimination at Monsanto. Plaintiffs allege that "Defendant Monsanto Company has maintained and continues to maintain discriminatory employment policies with respect to hiring, compensation, promotions, transfers, training, and other terms and conditions of employment which has the effect of limiting, classifying and segregating black employees solely on account of race." (Plaintiffs' First Amended Complaint, ¶ III, p. 4). Specifically, plaintiffs allege that Monsanto maintains employment policies which relegate black employees to less remunerative and less responsible job positions; systematically exclude black employees from qualifying for job promotions and training programs; exclude black employees from obtaining overtime compensation; and provides less benefits and pay for black employees doing compa-

rable or equal work. Plaintiffs further allege that Monsanto maintains and has maintained discriminatory educational requirements with respect to hiring, job promotions and job transfers, and the foregoing allegations are intended to be representative but not inclusive of a pervasive companywide practice of discrimination against blacks on account of their race. Plaintiffs further allege that the AFL–CIO and Local 347 are "the bargaining agents for production, maintenance and operating employees of defendant Monsanto, and defendant Council and Local 347 have acquiesced and contrived to acquiesce in defendant Monsanto's unlawful employment policies, and failed to represent plaintiffs and the members of their class fairly because of their race." (Plaintiffs' First Amended Complaint, ¶ IV(H)(I), p. 6).

The question presented is whether the allegations in plaintiffs' judicial complaint are like or related to the allegations contained in the charge, or could reasonably be expected to grow out of the charge of discrimination. *Sanchez v. Standard Brands, Inc., supra* at 466. In this regard, the Court is mindful that

> [t]he Act was designed to protect the many who are unlettered and unschooled in the nuances of literary draftsmanship. It would falsify the Act's hopes and ambitions to require verbal precision and finesse from those to be protected, for we know that these endowments are often not theirs to employ.

> [S]ince the Act involves a "lay-initiated proceeding," *Jenkins v. United Gas Corp*, 5 Cir. 1968, 400 F.2d 28, 30, n. 3, "it would be out of keeping with the Act to import common-law pleading niceties to [the charge of discrimination] or in turn to hog-tie the subsequent lawsuit to any such concepts." *Id.* This Act was designed to protect a worker from becoming an industrial pariah, and his lack of literary acumen should not stymie his quest for equal employment opportunity.

*Sanchez v. Standard Brands, Inc., supra* at 465.

In light of these guiding principles, the Court concludes that plaintiffs may raise the issues set forth in paragraph IV of their First Amended Complaint, but only insofar as those issues relate to discrimination in overtime work assignments in the trucking department at Monsanto. For example, plaintiffs may attack the alleged policy of relegating black employees to less remunerative and less responsible job positions insofar as the policy indirectly or directly affects overtime work assignments. Similarly, plaintiffs may attack the promotion and training policies, or educational policies complained of insofar as they directly or indirectly affect overtime work assignments. Conversely, plaintiffs may not attack the educational requirements, promotion or training policies of the company insofar as they relate to other matters not affecting overtime work assignments in the trucking department at Monsanto.

It is important at this point to understand the distinction the Court must make between limiting issues that may be raised because of the adequacy of plaintiffs' representation, and limiting issues that may be raised because of the "scope" of the charge filed with the EEOC. As stated in § A at n. 3, *infra*, a person aggrieved can represent other victims of the same policies, whether or not all have experienced discrimination in the same way, including former as well as present and prospective employees. However, to say that a plaintiff has the capacity as a member of a class to represent others discriminated against in a different way, is not to say that the plaintiffs may do so without meeting the basic and fundamental requirement of satisfying the jurisdiction of the Court over the claim before it. Notwithstanding a plaintiff's capacity adequately to represent the class, a plaintiff may only raise those issues like, related to, or growing out of the charge because the Court's jurisdiction is limited to those issues.

Because the Court concludes that plaintiffs may raise the issues set forth in Paragraph IV of their First Amended Complaint but only insofar as those issues relate to discrimination in overtime work assign-

ments in the trucking department at Monsanto, and that plaintiffs Nixon, Earls, May and Beard may continue in the case as plaintiffs, defendants' motion to limit issues will be granted in part and denied in part.

For the reasons stated, it is ORDERED, ADJUDGED AND DECREED that

(1) Plaintiffs' Motion to Redefine the Class is GRANTED.

(2) The Court conditionally certifies pursuant to Rule 23(b)(2) the following subclasses:

   A. All blacks who were within the class certified in *Sanders*, but who elected to opt out;

   B. All black employees of Monsanto Company hired on or after June 4, 1963; and

   C. All blacks who apply for employment with Monsanto in the future.

(3) Defendants' Motion to Limit Issues that plaintiffs may raise under Title VII is GRANTED in part and DENIED in part.

(4) Plaintiffs' Nixon, May, Earls, and Beard may continue in this case as plaintiffs. Their Title VII action, however, is limited to the issues that plaintiff Hebert may assert.

(5) Plaintiffs may raise the issues set forth in Paragraph IV of their First Amended Complaint, but only insofar as those issues relate to discrimination in overtime work assignments in the trucking department at Monsanto.

DONE at Galveston, Texas, this the 6th day of October, 1980.

## FINAL JUDGMENT

For the reasons set forth in this Court's Memorandum and Order of even date herewith, it is

ORDERED, ADJUDGED and DECREED that plaintiffs take nothing, and this action be DISMISSED on the merits. Taxable costs of court, if any, shall be borne by the parties respectively.

This is a final judgment.

DONE at Galveston, Texas, this the 2nd day of September, 1981.